# A. J. CHAMBERS v. LILLIAN CHAMBERS, Appellant.

**Division One, March 31, 1910.**

1. **EQUITY: Finding of Fact.** In a suit to cancel a deed, admitted to be a suit in equity, the finding of the chancellor that the deed had never been delivered is not, like the verdict of a jury in a law case, binding on the appellate court.

2. **LIMITATIONS: Against Minor.** If the grantee in the deed sought to be cancelled was a minor when it was executed, no adverse possession by the grantor of the land set the Statute of Limitations to running against her so long as she remained a minor.

3. **EQUITY: Suit to Cancel Deed: Defense of Ejectment: Abandoned on Appeal.** Where the suit was brought to set aside a deed made to defendant by her father the plaintiff, a second count in her answer, in which, by way of cross-petition, she brought ejectment, may be abandoned and waived on appeal, in open court, by leave of court; and where such abandonment is based on a disclaimer of any want to dispossess her father during his lifetime, it will be allowed.

4. ———: ———: ———: Remanding Cause: Grafting Legal Action on Equity Suit. And that being done, the action of ejectment is out of the case, and if a reversal should follow on the issue of the delivery of the deed set up in the petition to cancel the same, it will not be necessary (1) to remand the cause, nor (2) to determine whether a legal action of ejectment can be grafted by defendant upon plaintiff's suit in equity to cancel a deed.

5. **DEED: Delivery: Intention.** A delivery of a deed is consummated when the grantor, by act or word or both, parts with his dominion over it with the intention to make it operative, and it is accepted by the grantee. Such intention, however elusive and difficult to seek out, is of the essence of delivery. Delivery is not determined by any fixed and arbitrary rule, but must be worked out with reference to all the facts in judgment.

6. ———: ———: To a Child. Facts tending to show delivery to an infant grantee might not be held so conclusive were the grantee an adult.

Chambers v. Chambers.

7. ——: ——: **Intention: How, Shown and Ascertained.** The grantor knows more about the processes of his own mind than anyone else does; and so long as his secret intention is not so weighed down by his acts as to mislead other persons to their injury and thereby estop him, he may testify as to what his secret intentions were when he executed the deed. But when he does so testify, many years after the event, in his own interest, he may inform but he does not thereby bind a court of conscience, for his testimony is to be weighed and interpreted in the light of his admissions and statements off of the stand and the whole course of his conduct.

8. ——: ——: **Effect of Record.** The effect of our registry act is to make a record of a deed by the grantor take the place of the significant common law ceremony of livery of seizin. It is a solemn proclamation to the world, of which the world must take notice, that there has been a transfer of title from the grantor to the grantee. The record of a deed by the grantor is presumptive evidence of the deed's delivery—evidence of a most cogent character tending to show delivery.

9. ——: ——: **Acceptance: Infant Grantee.** To consummate a delivery of a deed, acceptance by the grantee is essential; but acceptance will be presumed where the grant is beneficial; and where the grantee is an infant child of the grantor and the grant is beneficial, courts are fond of resting on a presumptive acceptance. But such presumption is rebuttable.

10. ——: ——: ——: ——: **Rebutting Presumption of Acceptance: Necessary Evidence.** To rebut the presumptive acceptance by an infant child of a beneficial grant from her father and its operative effect as a conveyance, the testimony must not be loose or inconclusive, but so clear and convincing as to remove all reasonable doubt. And the same character of proof is necessary to show non-delivery of a deed put of record by the grantor.

11. ——: **Suit to Cancel: Made to Defeat Creditors: Delivery.** Where the grantor's acts and written words concerning an unconditional conveyance to his infant daughter, which he put of record, comport as well with his one-time avowed purpose to defeat his creditors, as with his position at the trial that it was only intended to take effect and provide for her in case of his death, it will not be set aside on the issue that it was not delivered and was not accepted by her.

12. ——: ——: ——: ——: **Bad Intent.** Although the grantor intends a fraud, yet unless he delivers the deed, as that term is defined in the law, it remains inoperative between the parties. But that doctrine goes hand-in-hand with another

proposition, namely, that when a party starts out on the road to commit a fraud and nothing is in the way to hinder the working of his will, he is likely to consummate the desire—in this case, by delivering the deed.

13. ———: ———: **Delivery: In Contemplation of Death.** The sending of the warranty deed to the recorder, with the recording fee, when the grantor, having some months previously suffered sunstroke, was in a strange town on a journey to relatives in another State, makes it impossible to believe he thought himself to be in the presence of impending death and in its shadow hit upon the plan of making and recording the deed, in which he preferred his youngest infant daughter, intending no delivery, but expecting to consummate the delivery if he should be stricken down.

14. ———: ———: ———: **Credibility of Witnesses.** In an equity case, if the decision turns on the credibility of witnesses, not the same deference can be given to the chancellor's finding if he took a long time to consider before deciding, as would be given to a conclusion springing instantaneously.

15. ———: ———: **Consideration.** The fact that no consideration was paid for the warranty deed from a father to an infant child amounts to nothing in a suit by him against her to cancel the deed.

Appeal from Grundy Circuit Court.—*Hon. G. W. Wanamaker*, Judge.

REVERSED.

*Flansburg & Williams* and *Hall & Hall* for appellant.

(1)  The petition fails to state facts sufficient to constitute a cause of action.  The deed in question being a regular warranty deed with all the usual covenants, having been voluntarily made and filed for record by plaintiff, uninfluenced by appellant or any other person, no extrinsic evidence of the plaintiff's intentions or purpose in making the deed was admissible.  R. S. 1899, sec. 3416; Price v. Kane, 112 Mo. 412; Weiss v. Heitkamp, 127 Mo. 23; Rogers v. Ramey, 137 Mo. 598; Bartlett v. Trinsley, 175 Mo. 319; Rich-

ardson v. Champion, 143 Mo. 538; Hillman v. Allen, 145 Mo. 638. The evidence of plaintiff as to his intentions in making and sending the deed to the recorder to be recorded was inadmissible. It was his province to state all the facts in connection with the making of the deed, and it was for the court to determine what his intentions were. Owen v. Ellis, 64 Mo. 77; Vawter v. Hultz, 112 Mo. 639; Perkins v. Fulding, 119 Mo. 149; Derry v. Fielder, 216 Mo. 176. (2) The execution and filing of the deed for record by the plaintiff are strong evidence of the delivery of it to the defendant, and the burden is upon the plaintiff to prove by clear countervailing evidence that he did not intend it as a delivery. Burke v. Adams, 80 Mo. 504; Blight v. Schenck, 10 Pa. St. 289. The countervailing proof therefore that the recording was not designed as a delivery should be clear and persuasive in the instance where the grant was against the interest of the grantor, as where the receipt of the purchase money is acknowledged in the deed. In an early decision our Supreme Court held that the recording of a deed did away with the old common law livery of seizin. Perry v. Price, 1 Mo. 555. In Ayres v. Hayes, 13 Mo. 252, it was held that a deed of trust recorded by the maker without the knowledge of the beneficiary was a substantial delivery. Its acceptance by the *cestui que trust* might be presumed, because the grant was for his benefit; and in Pearce v. Dansforth, 13 Mo. 360, it was held that 'the delivery of a deed by the grantor for the purpose of having it recorded may under proper concurring circumstances be regarded as a delivery to the grantee.' Both on authority and reason, where the deed is duly executed, acknowledged and put to record by the grantor it is persuasive evidence as against him, especially where the purchase money is receipted for, that he intended thereby to pass the title; and the act would throw the burden on the grantor and his

privies to show by clear countervailing evidence that it was not a delivery. Tobin v. Bass, 85 Mo. 654; Standiford v. Standiford, 97 Mo. 231; Kane v. Mc-Cown, 55 Mo. 181; Hall v. Hall, 107 Mo. 107; Kingman Co. v. Buggy Co., 150 Mo. 309; DeVorse v. Snider, 60 Mo. 236; Lumber Co. v. Anderson, 13 Mo. App. 429; Majors v. Hill, 13 Mo. 250; Coulson v. Coulson, 180 Mo. 709; Marshall v. Hartzfelt, 98 Mo. App. 178; Colee v. Colee, 122 Ind. 109. (3) The plaintiff by his attorneys expressly admitted on the trial, "that the plaintiff was mentally competent and responsible at the time of executing and recording the deed," and it must have been made and filed for record either with the intention and purpose of vesting the title to the property in the defendant for her own use and benefit, or as a resulting trust for the use and benefit of plaintiff, the grantor, but the evidence necessary to establish a resulting trust "must be clear, strong, unequivocal and so definite and positive as to leave no room for doubt in the mind of the chancellor." Woodford v. Stephens, 51 Mo. 443; Forrester v. Scoville, 51 Mo. 268; Modrell v. Riddle, 82 Mo. 31; Sweet v. Owens, 109 Mo. 1; Rogers v. Rogers, 87 Mo. 257; Railroad v. McCarty, 97 Mo. 214; Taylor v. Von Schrader, 107 Mo. 206; Curd v. Brown, 148 Mo. 82; Viers v. Viers, 175 Mo. 444; Reed v. Speery, 193 Mo. 167; King v. Isley, 116 Mo. 155; McFarland v. La Force, 119 Mo. 585; Derry v. Fielder, 216 Mo. 176; Plumb v. Cooper, 121 Mo. 668. (4) The repeated declarations by the plaintiff, that he had deeded the land to appellant and that he intended for her to have it, being made against plaintiff's interest and at times when it was his duty to speak the truth, especially in the letter written to the loan company, when his attention was directly called to the making of the deed, are presumed to be true, and afford proof of the most satisfactory character. 1 Am. and Eng. Ency. Law (2 Ed.), 723; Bogie v. Nolan, 96 Mo. 85; State v. Brooks, 99

Mo. 137; Feary v. Railroad, 162 Mo. 75; Shepherd v. Railroad, 189 Mo. 362; McCaffery v. Railroad, 192 Mo. 144; Kirkpatrick v. Railroad, 211 Mo. 68; Erwin v. Railroad, 94 Mo. App. 289. (5) The deed from plaintiff to the defendant being absolute in form and for the benefit of defendant, and having been voluntarily recorded by the plaintiff, and defendant being his infant daughter, her acceptance of the deed will be presumed. Tobin v. Bass, 85 Mo. 654; Standiford v. Standiford, 97 Mo. 231; Hall v. Hall, 107 Mo. 101; Sneathen v. Sneathen, 104 Mo. 201; Kingman Co. v. Buggy Co., 154 Mo. 282; Colee v. Colee, 122 Ind. 109; Couch v. Harp, 201 Mo. 457; Whitaker v. Whitaker, 175 Mo. 1; Derry v. Fielder, 216 Mo. 191. Defendant being a minor at the time of the execution and delivery of the deed to the recorder for record, she had three years after she became twenty-one years of age to accept it. R. S. 1899, sec. 4265. She was under disability at the time, and the same rule of law as to her disability in making a deed would apply in accepting a deed made to her. Shaffer v. Detie, 191 Mo. 377. (6) To warrant a court of equity in establishing title contrary to the terms of a deed the clearest and most convincing proof must be made. Shaw v. Shaw, 14 Mo. App. 580; Schnabel v. Schnabel, 12 Mo. App. 587; Sharp v. Berry, 60 Mo. 575; Brinkman v. Sunken, 174 Mo. 709; Curd v. Brown, 148 Mo. 82; Derry v. Fielder, 216 Mo. 176; Parsons v. Parsons, 45 Mo. 265; Hall v. Hall, 107 Mo. 101. (7) The deed took effect and the title vested in the defendant upon the delivery or the filing of the deed for record, and no subsequent act or intention of the plaintiff could divest it. The deed being purely voluntary and uninfluenced by any one, and the plaintiff's attorneys having disclaimed any mental incapacity, the deed cannot be set aside because the grantor afterwards changes his mind. Doherty v. Noble, 138 Mo. 24; McKinney v. Hensley, 74 Mo. 326; McKissock v. Groom, 148 Mo.

459. (8) If plaintiff made the deed to defendant to put it beyond the reach of his creditors as stated in his letter to the investment company, dated August 23, 1905, then it was fraudulent as to his creditors and he does not appear before the court with clean hands, and the court will not aid him in his fraudulent transaction. Derry v. Fielder, 216 Mo. 176; McNear v. Williamson, 166 Mo. 365; Morrison v. Jullen, 145 Mo. 282; Little v. Cunningham, 116 Mo. App. 549; Pomeroy's Equity Jur., sec. 397, 404.

*Hubbell Bros.* for respondent.

(1) No delivery, no deed—no title. 9 Am. and Eng. Ency. Law (2 Ed.), 150, 153, 154, 159, 160; Tiedeman, Real Prop., sec. 812, p. 642; 13 Cyc. 560, 567, 568, 746, 750. (2) The question of delivery is a question of intent. Tiedeman, Real Prop., sec. 813, pp. 645, 646; Drinkwater v. Hollar, 91 Pac. 664. (3) Recording is but some evidence tending to show a delivery. McCune v. Goodwillie, 204 Mo. 338; Young v. Guilbeau, 3 Wall. 636; Miller v. McCaleb, 208 Mo. 580; Parmalee v. Simpson, 5 Wall. 81; Rausch v. Michel, 192 Mo. 293; Hammerslough v. Cheatham, 84 Mo. 13; Huey v. Huey, 65 Mo. 689. (4) Whether there was an intention to deliver the deed, must be determined by a consideration of all the facts and circumstances in the case. Powell v. Banks, 146 Mo. 620; Const. Co. v. Tie Co., 185 Mo. 25; McCartney v. McCartney, 55 S. W. 312; Stevens v. Castel, 29 N. W. 828; Drinkwater v. Hollar, 91 Pac. 664; Miller v. Lullman, 81 Mo. 311; Cravens v. Rossiter, 116 Mo. 338; Scott v. Scott, 95 Mo. 319; Vansickle v. Brown, 68 Mo. 634; 7 Ency. Ev., 596, 597, 598, 625, 626; Jones on Ev. (2 Ed.), sec. 170; 4 Ency. Ev., 170; North St. Louis Assn. v. Obert, 169 Mo. 515; Abb. T. B. 434. (5) Where the question is whether a deed was delivered, parol evidence is competent. Powell v. Banks, 146 Mo. 633; Vawter v. Hultz, 112 Mo. 640; Perkins v. Field-

ing, 119 Mo. 149; Burke v. Adams, 80 Mo. 513; Cravens v. Rossiter, 116 Mo. 344. Measure of proof. Burke v. Adams, 80 Mo. 513; Tobin v. Bass, 85 Mo. 658; Sheperd v. Transit Co., 189 Mo. 373. The alleged admissions are of little weight. Russell v. Sharp, 192 Mo. 289; Green v. Yarnall, 6 Mo. 326; Peters v. Berkemeier, 184 Mo. 393. Fraudulent intent cannot constitute a delivery. Koppelmann v. Koppelmann, 57 S. W. 572; Burke v. Adams, 80 Mo. 515; Barns v. Hatch, 14 Am. Dec. 369; Creamer v. Bivert, 214 Mo. 484. (6) The weight and credibility of the evidence is on the side of the plaintiff. Peters v. Berkemeier, 184 Mo. 393; Erler v. Erler, 124 Ia. 726; Richards v. Moran, 114 N. W. 1035; Culp v. Price, 107 Ia. 133; O'Connor v. O'Connor, 100 Ia. 476; Griffin v. McIntosh, 176 Mo. 392; Mfg. Co. v. Waring, 46 Fed. 106; 2 Moore on Facts, sec. 784. (7) The trial judge decided this case on a correct theory and understanding of the law. The appellate court will defer to the finding of the trial court. McNear v. Williamson, 166 Mo. 358; Metal Co. v. Daugherty, 204 Mo. 75; Finkelnburg, Mo. App. Prac. (2 Ed.), 149, 158, 163.

LAMM, P. J.—Plaintiff claiming to own the west one-half of the southwest quarter of section 9, township 62, range 24, in Grundy county, sues to cancel his deed conveying the same to Lillian, his daughter, and to remove the cloud on his title arising from its record.

In one view of it the suit is under section 650 to determine title, but there are allegations involving equity jurisdiction and equitable relief is asked. The deed bore date July 28, 1891, and was recorded promptly in the office of the recorder of deeds of said county. The grounds in the petition on which relief is predicated are that it was neither delivered nor accepted; that it (quoting) "was signed and acknowledged and recorded only for the *prospective purpose of putting*

*the plaintiff in the position to temporarily provide for his family,* and it never at any time became expedient for the plaintiff or any one else to make use of said deed for any purpose and no exigency for which said deed was signed and acknowledged had ever arisen;'' and that (quoting) ''said deed, so signed and acknowledged, was wholly without consideration and totally ineffective as a conveyance of title and is void, and was signed and acknowledged and recorded without the knowledge of defendant, and without any agreement or contract between any parties with respect to signing, acknowledging or recording of said deed.''

The petition also counts on adverse possession under a claim of ownership as against defendant for more than ten years.

The answer is in two counts. The second is a cross-action in ejectment with conventional averments. The first states a defense, in substance, that the deed was executed and recorded by plaintiff to make provision for defendant, at the time an infant of tender years, and conveyed an absolute and unconditional title.

The reply averred, by inference at least, that at the time of making the deed, plaintiff through mental derangement was incapable of transacting ordinary business. On motion this allegation was struck out. Other allegations in the reply are that his wife had died some time before, that his dwelling-house had been consumed by fire, that he had a family of children of which defendant was the youngest, that housekeeping was abandoned and a return to Illinois undertaken as a result of this combination of misfortunes. Plaintiff puts himself on that journey and while en route what happened is described in the replication as follows: '' . . . anxiety for the welfare of his family, and especially for the welfare of this defendant, so oppressed plaintiff that he decided to so arrange his affairs that he could promptly and effectively pro-

tect and provide for defendant, should his own life be endangered by the condition of his health or accident of any kind. Plaintiff accordingly signed, acknowledged and caused to be recorded the deed in question, with the intention, understanding and belief that the instrument would become effective as a conveyance when and only when he had delivered it or caused it to be delivered to defendant or to some one for her. Plaintiff did not intend for any delivery to take place, or for said deed to be delivered to defendant, unless the aforesaid contingency or emergency should arise in such a way as to make it expedient for him to make such disposition of his property. No such emergency or contingency ever arose and no delivery of the said deed was ever made to the defendant, or to any one for her. From the date of said deed until now, plaintiff has continuously, notoriously and adversely occupied said land, claiming it as his own, paying taxes thereon, making improvements thereon, and taking rents and profits thereof for his own exclusive use and benefit.''

On hearing, the chancellor took much time to consider, presently entering a decree for plaintiff on the theory of no delivery of the deed. From that decree, defendant appeals.

I. Certain subordinate questions will be disposed of at the outset to clear the way for the main controversy.

(a) It is argued here by plaintiff's counsel (as we gather it) that it was their intention to ask formal declarations of law below, but that the court throughout the trial so satisfactorily ruled as to indicate a correct understanding of the law of the case; therefore, no such declarations were asked. And that, as the court found the facts relating to delivery of the deed against defendant, such finding is equivalent to a ver-

dict of a jury in a law case on the facts, and therefore binding on the appellate court.

But, if we outline the contention fairly, learned counsel are in error in their premise. This is not a law case. It is clearly in equity and counsel say so. In their brief is this: "The ground on which equity jurisdiction is invoked is that the deed, being on record, clouds the title of the plaintiff." In that view of it, instructions had no place in the case and on appeal the evidence comes here for our consideration as a court of conscience. True, we may defer to the trial court in weighing and applying that evidence, but we are not bound by his view of it, nor, though his finding of facts is persuasive and advisory, are we bound by such finding. In this regard the rule in equity differs essentially from that applicable to law cases on appeal.

(b) One of plaintiff's grounds for relief is that he has title by grace of the Statute of Limitations; but no facts warrant the application of that rule of written law. Defendant, at the time the deed was made and recorded (1891), was a little girl six or seven years old. At the time of bringing the suit (1905) the statute had not run against her, even if we should conclude there was evidence (on which we say nothing) tending to show it ever began to run through an adverse possession and claim of right in plaintiff. That feature of the case is therefore put aside.

(c) Defendant, in the second count of her answer, by way of a cross-petition, brought ejectment. As we read her testimony, she repudiates such form of relief. Supplementing that repudiation her learned counsel, *ore tenus* and by brief, plant themselves on the same platform. In effect they disavow any complaint of the disposition below of the issue raised by the court in ejectment. They proclaim at this bar that their client does not want possession of the land in the lifetime of her father. Surely they may make such abandonment and waiver in open court by leave of the

court itself.   And, as to leave of court, we say this:
The atmosphere of the plane on which a court moves
is not so frosty that no buds of sentiment may swell
and bloom there.   No court is so high and cold that it
may not be generous, therefore far be it from us to re-
fuse judicial aid and judicial commendation to the gen-
tle flow of filial affection, whether that flow be early
or late, weak or strong.   The premises considered, we
deem the action in ejectment out of the case on appeal,
and practically at rest.   In this view of it, if we finally
conclude the decree should be reversed on the issue
of delivery of the deed, it will not be necessary to re-
mand the case for further determination of the cross-
action brought by defendant.   And in this view of the
matter it will not be necessary for us to determine a
novel question of practice, *viz.,* whether a strictly legal
action of ejectment may be grafted by defendant on the
stock of plaintiff's suit in equity looking to the cancella-
tion of a deed and the removal of a cloud upon plain-
tiff's title.

II.   With the foregoing disposition of subordinate
questions, we come to the main bone of contention,
*viz.,* the delivery of the deed.   This issue seeks the
facts.

The material undisputed facts follow:

In 1887 Chambers, then fifty-four years old and
twice married, came from Illinois and bought the land
from one Proctor for $1200, assuming as part of the
purchase price a mortgage for $350 due the Darrow
Investment Company of Corning, Iowa.   He gave Proc-
tor a second mortgage for $250, paying down half the
price.   He brought to his new home his wife and six
children, leaving a married daughter, Mrs. Briggs, in
Illinois.   In 1889 his wife died.   A year or so later
his dwelling-house burned.   One of the daughters tar-
ried in the neighborhood and taught school.   Four of
the children, including Lillian, the youngest, went to

227 Sup—18

Illinois to their sister, Mrs. Briggs, shortly after the house burned, and, as we grasp it, the children (except Lillian) were of an age to look after themselves—at least Lillian was the father's chief solicitude. Plaintiff and one son remained in Missouri and rebuilt the house. In 1890 while stacking wheat he suffered a sunstroke, the evil effects thereof continuing for several years at odd spells. Now and then it caused dizziness, headache and a falling sickness. In 1891 he made a wagon journey to Illinois, renting out the land. On the road there, while at Quincy, Illinois, he went to a notary and had him write a plain and unconditional warranty deed conveying the land to Lillian. This deed, expressing a consideration of two thousand dollars (none of which was paid), he signed, acknowledged and inclosed with a one dollar bill in an envelope addressed to the recorder of deeds of Grundy county, at Trenton, Missouri, without any letter of instructions and sent it by mail on the 28th of July, 1891. On the next day it was received and put of record. It remained in the recorder's office. Defendant knew nothing about it at that time and never heard of it until in 1905, after she reached majority. It is not clear when the deed was taken from the recorder's office. Plaintiff produced it at the trial and presumably took it from the office at some time undisclosed.

Going back a little. After plaintiff sent the deed to the recorder with the record fee, he went on to Tazewell county, Illinois, where his daughter, Mrs. Briggs, resided and sojourned there the rise of a year, working in the neighborhood. In 1892 he returned to Grundy county. Shortly thereafter he was followed to Missouri by the Briggs people and they, during the year 1893, lived on the land. They brought back with them the defendant and one or two other children left in charge of Mrs. Briggs. We may as well say here that, while Lillian was in Illinois, plaintiff seems to have assisted in her support, but Mrs. Briggs assumed, with

plaintiff's consent, a relation *in loco parentis* to her, and the chief burden of her support, care and education from thence forward devolved upon her. In 1893 plaintiff married a widow with six children who owned and lived upon a farm close by the *locus in quo*. It is plain that at this time the relation between plaintiff and the Briggses became strained. The merits of the quarrel are not here, and if they were they would obscure, rather than throw light on, the deciding issue. Shortly thereafter they moved to Nebraska and took with them Lillian and her sister next older. Plaintiff continued to reside on the land from that time to this. He paid off the second mortgage to Proctor, but seems to have left it unreleased of record. He was a man brittle in temper, testy, a hard working man, a farmer and by trade a plasterer and stone mason—a man of will power and action, somewhat illiterate, but the record is devoid of any evidence that he was not thoroughly competent to transact his own business as sense and discretion prompted him. At this point it is not amiss to state that the following statement in open court was made during the trial by plaintiff's counsel: ''The plaintiff expressly denies of record any intimation that this deed was signed and acknowledged or anything else done when he was mentally irresponsible or mentally incapacitated, but expressly alleges that at the time this deed was signed and acknowledged and recorded the plaintiff was mentally sound and responsible.''

Plaintiff paid the taxes on the land, improved it somewhat, and by renewals extended the mortgage of the Darrow Investment Company. At a certain time that investment company, in connection with an extension of their mortgage, discovered the title was in Lillian Chambers. As the papers in prior renewals had been signed alone by the plaintiff, this discovery provoked inquiry and a correspondence sprang up between the investment company and plaintiff anent

the matter. The company took the position that Lillian Chambers should sign the renewal papers with plaintiff and it naturally wanted to know how it came that plaintiff assumed to make former renewals without any apparent consent from her. She was at this time a sophomore in the University of Nebraska and in straitened circumstances. The vicissitudes of life had broken the fortune of the Briggs people, but Mrs. Briggs was doing what she could to give her sister an education and was assisted by another sister, Mrs. Ward. Spurred to it by the company, plaintiff, so he says, wrote defendant to make the title over to him. She testifies his letter was a request to sign the renewal papers. Be that one way or the other, she did neither in her present state of information. The information she presently obtained from other sources was to the effect that the record showed two mortgages unreleased, one for $350 and one for $250, and that there was danger of foreclosure. It seems she then undertook on her own initiative to borrow enough money from the Darrow Investment Company to pay off both these mortgages and leave a margin of $150 or $200 for present needs. The papers relating to this loan were sent by the company to plaintiff's postoffice in Missouri, addressed to defendant, and were taken from that office and opened by plaintiff. Based on the information thus received, *viz.*, that his daughter had made application for this loan, plaintiff at once sued.

We now come to a set of facts in dispute, some of which are material and some not. For instance, something is made of the contention by respondent that defendant was "kidnapped" or taken from her father against his will in Missouri and carried to Nebraska and raised there a stranger to his hearth. A mass of testimony was introduced pro and con more or less bearing on that issue, but it throws no light on the issue of delivery; for if the deed was delivered it was delivered before any misunderstanding arose between

plaintiff and the Briggs people in 1894. So, the child was in no wise to blame in that controversy. She naturally turned to her sister as a second mother and "clave unto her" as Ruth to Naomi. Especially so when to remain in Missouri was but to share her father's love with a family of six stepchildren alien to her blood. But if she be held derelict in going and remaining with her sister against her father's protest, yet any change in his feeling resulting from such dereliction could in nowise avoid the operative force and effect of a deed once delivered. Therefore, we put this phase of the case away from us.

As bearing on the delivery of the deed a mass of evidence, showing the acts, words and conduct of the plaintiff, was introduced to elucidate and establish plaintiff's intent at the time he made and recorded the conveyance. There was evidence that about thirteen years before the institution of the suit plaintiff told his daughter, Mrs. Ward, in substance, that the place was to go to Lillian at his death and that he asked her, Mrs. Ward, to say nothing about it. Mrs. Ward so wrote to defendant in 1905, but on being introduced as a witness on behalf of plaintiff she undertook to explain away that statement and testified that she knew nothing about the deed until she heard of it through her brother, Andrew, about a year before the trial. Andrew testified he told Mrs. Ward about that time that his father about a year before first told him the place was in Lillian's name but that the deed "was no account." The plaintiff testified he told no one but his son, Andrew, and had kept it to himself because he considered the deed "of no account." Mrs. Briggs testified she had heard her father say at different times that "what he had should go to Lillian," and this was so early as the year he returned from Missouri to Illinois and so late as three years ago; that "Lillian would get what he had." Mr. Briggs testified that when plaintiff was living with him he heard him

say that the particular property in controversy "should go to Lillian;" that it "should be hers," and this was said so many as twelve years ago in Illinois and in Missouri. In none of the conversations with Mr. and Mrs. Briggs did he use the word "deed." At a certain time in 1896 plaintiff insured the house on the land in a local mutual farmers' insurance company. Some two years later a dispute arose between the secretary of the company, Mr. Frey, and plaintiff, in regard to an assessment to pay losses. Plaintiff seemed to think there had been a double assessment. It came to the ears of the secretary that plaintiff was telling his neighbors the farm was not his and they could collect nothing on the assessment. Mr. Frey, on the stand, said he taxed plaintiff with making this statement and was informed by him "that the property had been deeded to the children." Plaintiff said to him that it was "in the children's name and he didn't think the insurance was worth much." It seems the insurance company treated this information lightly. It afterwards collected the assessment and held on to the insurance under the theory that he could insure the property in his own name if the children were minors, but if they were adults the insurance would be void. One Brokaw, a very fair witness and friendly to plaintiff, testified that plaintiff told him he "had made a deed to one of the girls." "I made a deed of my farm to my girl." He told this at witness's blacksmith shop when they were talking about men making deeds or deeding away their places before they were done with them. At that time plaintiff owed Brokaw a blacksmithing bill and he said to plaintiff in a joking way: "Well, if you have deeded your farm away, what am I going to do?" And plaintiff replied: "Don't fret, you will get yours." To a witness, James Naples, who was living on his place, he said he had made a deed to his youngest daughter to the land. In complaining about a double

assessment of the insurance company he told Harry Hall, another witness, that he would not pay it and they could not make him for he was not worth anything; that "he didn't own anything." He told Ira Smith, a neighbor, also a witness, that his "farm was not in his name," and "I have got nothing in my hands." Judge Burkeholder testified that Mrs. Ward told him in relation to the making of the deed that she always knew it from the time it was done and that her father told her about it—this in contradiction of the explanation made by Mrs. Ward on the witness stand of the statement in her letter that she had known it for thirteen years. Mrs. Clemens, one of plaintiff's daughters, testified that she never had heard the deed mentioned by her father.

A correspondence between plaintiff and the Darrow Investment Company has been referred to and is of much significance. In that correspondence the investment company spoke of the fact that plaintiff had been signing the extension agreements after he had parted with his title, and suggested that he either procure a reconveyance from his daughter or obtain her signature to the extension agreement. In reply plaintiff intimated he could get the money to take up the loan in the following September from a neighbor who had money to let out at five per cent, and that the investment company could have its money if it could wait till then, winding up his letter as follows (omitting bad spelling): "And if you think it will do any good for my daughter to sign the papers she will do it. She is in Lincoln, Nebraska, at the University finishing education. You seem to think that is something terrible because I have signed those papers. Now she was about three years old when they were made and I would like to know who had any better right to attend to her affairs than her father. Now I want to hear from you." Later in the correspondence he wrote a letter of date August 23, 1905, explanatory

of why the deed was made to his daughter Lillian. A clause in that letter reads as follows: "When I deeded this land away I was $1500 in debt and they were crowding so I had to do it to save my home. I have paid it all off but your claim, would have paid your claim before now if it had not been for high water." On the witness stand plaintiff undertook to explain away the damaging admissions in that letter by saying that he was so troubled he did not know what he wrote. He then testified that he had owed $1500, but had paid it down to $700 before the deed was made; that no one was crowding him for any debt and that the statements in the letter as to his object in deeding the land away were false. This letter was written but three days before he brought his suit to set the deed aside.

We shall have something to say later on in relation to the fact that the guarded generality of the language in the petition, explaining why the deed was made, is well susceptible of a construction in harmony with the explanation given in the aforesaid letter, to-wit, that it was made to save the land from creditors.

The reply was filed on the 22d day of January, 1906, when, for the first time, plaintiff hazards putting himself on record in a full and clear explanation of his reasons for making and recording the deed. When on the stand his testimony followed the lines of the reply, running in brief, so far as material to his lack of intent to deliver, as follows:

"I went to a notary public . . . he filled out the deed . . . I ordered him to. . . . Well, he filled it out and I signed it and then after I got it I didn't know hardly what to do with it. I had no place to put it unless I carried it in my pocket. It was rather unhandy and I thought once I would tear it up. . . . Yes, sir, I thought I would tear it up. Then I concluded I could send it back to Trenton by mail to the recorder's office and leave it there until I should want

to call for it." Having testified that he inclosed it with a dollar bill and sent it to the recorder by mail, he stated that his health was not good at that time on account of having been overheated and being afflicted with dizzy spells. The court permitted the witness to give in evidence his intent. in doing what he did in making the deed and sending it to the recorder and his answer was: "Well, I intended if I got sick and was likely to die or something in that case I would have it turned over to Lilly Chambers, and if not I didn't calculate it was any account if it wasn't turned over." Recurring to the matter, the witness said: "I didn't calculate it was any account the way it stood until the thing was turned over. . . . Well, if I got sick and was likely to die I thought then I would have it turned over to her, have someone get it and turn it over to her."

On cross-examination plaintiff admitted that he inclosed the dollar for the purpose of having the deed spread of record. On being inquired of further as to his intent in making the deed, he was asked this question: "I believe you said that the reason you made this deed to your daughter was in case you got sick and died she should have the property?" His reply was: "Well, provided I had the title turned over to her, not without it." He was then asked: "You wanted her to have it?" And replied: "Not unless I got sick and was about to die."

The record next disclosed the following questions and answers:

"Q. That was your purpose, it was for her protection, and you wanted to provide for her? A. Well, it would have been if I had got sick and was about to die at that time.

"Q. That was the reason also that you sent it over to Trenton and had it recorded? A. I didn't have any place to put it. I was amongst strangers

there, pretty nigh. There was a fellow in Quincy I had raised and I was stopping with him.''

Can the decree stand on such a record? In our opinion, no. This, because:

Delivery is the life of a deed. Without delivery an instrument purporting to convey real estate, "though it be never so well sealed and written," and acknowledged under the dueguard of the formalities of the law, yet it is a mere dead scroll and hath no life in it. A delivery of a deed is consummated when the grantor by act, word or both, parts with his domination over the instrument with the intention to make it operative, and it is accepted by the grantee. Such intent, therefore, however elusive and difficult to seek out, is of the essence of delivery. Whether there is delivery is usually a mixed question of law and fact, and is to be determined by all the facts and circumstances of the concrete case. Delivery is not controlled by any fixed and arbitrary rule, but must be worked out with reference to all the facts in judgment. In this regard the personnel of the parties is of some weight. For instance, facts tending to show delivery to an infant child, might not be held so conclusive were the grantee an adult. The case at bar is free from the controlling effect of any conversation between the grantor and grantee or any controlling contract entering into it at the time, such as appear in many adjudicated cases. The case stands alone, then, on the writing, signing, acknowledging and recording of the deed as illuminated by the intention of the grantor at the very time those acts sprang into existence. It may be conceded that when the intention, a state of mind, is to be determined as an issue in a case, the actor or doer knows more about the processes of his own mind than does any one else. And so long as his secret intention is not so weighted down and drowned by his acts as to mislead other persons to their injury and thereby estop him, he may testify to

his secret intention when called as a witness. But when he does so testify, as here, at long range and many years after the event, to his secret intendment at the time, his testimony only goes for what it is worth. His saying that his intendment was this, that or other thing may inform but cannot bind a court of conscience. It is somewhat otherwise where the intendment of the party is clearly disclosed by spoken word at the very time of the act itself; for such spoken word becomes a verbal act, is part of the *res gestae* and molds and stamps the character of the act itself. Absent such declared intendment as part of the *res gestae,* the intention of the party must be ascertained as best the court can from all the evidence. The party's declarations of his intentions, made in his own interest, under the stress of a law suit on the witness stand, must be brayed in the mortar of reason with the pestle of common sense—that is, they are to be weighed and interpreted in the light of his admissions and declarations off the stand and in the light of what he did and his whole course of conduct in relation to the subject-matter.

In this case it stands conceded that plaintiff made, acknowledged and recorded the deed. The presence of the recording fee in the letter with the deed was a silent but unmistakable request or sign to the recorder to spread the instrument of record, and was so intended. The effect of our registry act is to make the record of a deed take the place of the significant common law ceremony of livery of seizin. It is a solemn proclamation to the world, of which the world must take notice, that there has been a transfer of title from the grantor to the grantee, precisely as in olden times there was a symbolical public transfer by delivery of a twig, a clod or a key. Such was the early holding in this State. [Perry v. Price, 1 Mo. 555.] Says Chief Justice McGirk in that case: "But delivery of seizin is to be supplied by registry . . . Here [re-

ferring to the registry act] the object of livery of seizin is more largely and completely effected than could be done by livery itself. The law goes for substance,'' etc. To the same effect is Burke v. Adams, 80 Mo. l. c. 512.

Accordingly it is steadily held that the record of a deed by the grantor is presumptive evidence of the delivery. Indeed, it is evidence of a most cogent character tending to show delivery, for it is tantamount to a public proclamation by the grantor at a public place, intended for the world to act upon, that the grantor had in apt and due form transferred his title (and thereby his land) to another. [Burke v. Adams, supra; Tobin v. Bass, 85 Mo. l. c. 658; McCune v. Goodwillie, 204 Mo. l. c. 338; Whitaker v. Whitaker, 175 Mo. l. c. 9.]

To consummate a delivery acceptance by the grantee is also an essential element; but it is a rule of law that acceptance will be presumed where the grant is beneficial, and, in case the grantee is the infant child of the grantor and the grant is beneficial, courts of justice are fond of resting on a presumptive acceptance in order to give operative effect to the conveyance. [Hall v. Hall, 107 Mo. l. c. 108; Standiford v. Standiford, 97 Mo. l. c. 239; Tobin v. Bass, 85 Mo. l. c. 658; Sneathen v. Sneathen, 104 Mo. l. c. 210.]

So that in this case we have the presumptive delivery of an unconditional deed and the acceptance of that deed. Such presumption of delivery is rebuttable and plaintiff could escape the operative effect of his conveyance in only one way, viz., by successfully carrying the burden of rebutting the presumption. We do not think he carried that burden successfully. The rule in this behalf in equity is that to divest title, declare a trust or cancel a deed, the testimony must not be loose or inconclusive but so clear and convincing as to remove all reasonable doubts; and the same character of evidence is called for to overturn a deed, put

Chambers v. Chambers.

of record by the grantor, by showing nondelivery. Deeds of record are much too solemn and stable instruments to be blown away with a mere breath of testimony, or overturned by evidence falling short of the stringent character indicated. [See authorities, supra; Derry v. Fielder, 216 Mo. l. c. 192 *et seq.*]

To our minds the damaging admission of the letter written by plaintiff to the investment company just before the institution of this suit, to the effect that he deeded the property to his daughter because of pressure from creditors, is more believable than his theory on the witness stand. The statements in that letter were against his interests and, since men usually do not make statements against their interests unless they are true, they are presumptively true. His admissions from time to time that he owned no real estate; that he deeded it to his child or children, which statements were in connection with discussing the payment of debts, or his ability to pay debts, comport better with that theory than with any other. So his admission of his concealment of the act of the conveyance from his other children and from the grantee herself does not well comport with the theory of no delivery. It should not be forgotten that at the time this deed was made the grantor had left the State of Missouri and debts behind. He was about to become a nonresident and may well have feared attachments. We draw an unfavorable inference on this score from the carefully guarded and general language of the petition. That language, used by him three days after he wrote the letter to the Darrow Investment Company, in which he asserted boldly that he had made the conveyance to be effective for a certain purpose, to-wit, to protect his land from his creditors, is susceptible of a veiled intimation of the same purpose. When six months later he gave his counsel the information upon which the reply was drafted he found no trouble

to state in plain language another theory which he eventually vouched for on the witness stand.

Courts of equity are chary of reaching out a helping hand to those litigants who voluntarily put themselves in the predicament of this plaintiff by a voluntary conveyance of land to hinder, delay or defraud creditors. [Creamer v. Bivert, 214 Mo. l. c. 485-6, and cases cited; McNear v. Williamson, 166 Mo. l. c. 365.]

It is argued that a bad intent on plaintiff's part does not take the place of delivery. In other words, although grantor intends a fraud, yet unless he delivers the deed, as that term is defined in the law, it remains inoperative between the parties. [Koppelmann v. Koppelmann, 94 Tex. l. c. 44 *et seq.*] This is sound doctrine, but it goes hand-in-hand with another proposition ruled in the Creamer case supra, to-wit, that when a party starts out on the road to commit a fraud and nothing is in the way to hinder working his will, he is likely to go on and consummate the act so within his desire and power—in this case, by delivering the deed. Where Will and Opportunity embrace results are bred.

But there is another view of the case, *viz.*, that plaintiff, solicitous of his health and the welfare of his youngest child, determined to convey the land to her. There is testimony that he intended to prefer her, that he deemed it his right as a parent to attend to her affairs, and that he recognized he had actually made such preference. We are asked to believe that plaintiff thought himself in the presence of impending death and in its shadow hit upon the plan of making and recording a deed, intending no delivery but expecting to consummate a delivery if he should be stricken down. But we hesitate to adopt that theory. The record of the deed seems in the way. He was at Quincy, a stranger except to one man, but he was going to a neighborhood where he was well acquainted. In this fix, he puts and leaves the physical custody of

the deed with the recorder hundreds of miles away. How could he expect such a deed to be delivered if he was suddenly called to face death? If that was his object he would naturally take the deed with him to his journey's end and have it at hand for use in such emergency. It is not clear to us either how he could have contemplated the rational act of delivery when stricken down by a falling sickness and temporarily unconscious.

The learned trial court took a long time to consider before deciding. That is evidence to our minds that the *credibility* of plaintiff as a witness was not the only factor in the decision. The tokens of that credibility were evanescent, and were exhibited at the trial. They consist in what the court saw and heard there—the many signs there shown of truthfulness, or the lack of it. Conclusions on that score by the chancellor would, therefore, spring spontaneously and instantaneously. So that, if the case broke on the point of credibility it called for a decision *instanter*. We are inclined to the view that the chancellor was constrained to decide the case on the legal effect and probative force of all the testimony, much of which was by deposition. And we have come to the conclusion that he reached a wrong result.

Referring to the theory of the case just discussed it is obvious that what has been said about delivery on other phases of the case applies to this theory as well.

There was no consideration paid for the land, but that amounts to nothing as between the parties to the deed in this form of action. The consideration of a deed is open to investigation. The clause acknowledging the payment of the purchase money is somewhat in the nature of a receipt and is subject to parol explanation for some purposes, but such explanation (and in the absence of fraud or mistake of fact) should not be pressed so far and hard as to defeat the opera-

tive words of the deed as a *grant*. [Bobb v. Bobb, 89 Mo. 411; Weiss v. Heitkamp; 127 Mo. 23.]

In any view of the matter we can take the deed was delivered and became operative as a conveyance. The decree therefore was for the wrong party. Accordingly it is reversed and judgment is entered here for defendant. All concur.