**DAVIS v. BOND et al.**

**No. 5627.**

Court of Civil Appeals of Texas. Texarkana.

June 6, 1940.

Rehearing Denied June 20, 1940.

Moore & Moore, of Paris, F. D. Wear, of Austin, and Hiram G. Brown, of Mt. Pleasant, for appellant.

J. A. Ward, of Mt. Pleasant, and Sam Billingsley, of Ft. Worth, for appellees.

WILLIAMS, Justice.

This litigation, in its final analysis, involves the question of the delivery of a deed which was executed and acknowledged in due form by Eliza Davis and husband, T. S. Davis, before W. H. Crawford, a notary, on November 23, 1923, filed for record December 24, 1930. The instrument is in the usual form of a warranty deed and purports to convey to her son J. B. (Ben) Bond and to his heirs and assigns forever, lot 2, block 42, of Talco Townsite in Titus County. The consideration expressed reads: " * * * $100 cash to us paid by J. B. Bond, the receipt of which is acknowledged, and the further consideration that the said Mrs. Davis shall retain possession, use and control of said property hereby conveyed during the remainder of her lifetime and that the said J. B. Bond shall have no control, use or possession of the said property until after the death of the said Eliza Davis." This lot was the separate property of Mrs. Davis. The $100 was not paid.

In February, 1933, J. B. Bond and Mrs. Davis, then a widow, executed, acknowledged and delivered to H. B. Busby an oil and gas lease covering the lot, being filed for record the same day. The assignee of Busby developed the lot into oil-producing property under this lease. Busby, his assignee, nor this leasehold are involved in this controversy but 1/8 of the oil runs held by a pipe line company are impounded. Three years subsequent to the execution of the Busby lease and twelve years after the warranty deed, and after the discovery of oil in the Talco area, Mrs. Davis executed, in February, 1936, three conveyances which purport to convey to Geo. W. Bond, another son, who had returned to that section, an oil leasehold and 3/4 of the royalty covering the lot. He, in turn, assigned the leasehold to one Farrar, and conveyed a part of the royalty to Whalen.

Appellees, Raymond Bond and others, the children and surviving wife of J. B. Bond, who died intestate at Talco on October 23, 1934, filed this suit September 15, 1937, against Nellie Chapman, a daughter of Mrs. Davis, Farrar, and Whalen, all of whom made default, Geo. W. Bond who executed a quitclaim deed to his mother and filed a disclaimer, the pipe line company which tendered into court the proceeds of 1/8 of the oil runs, and Mrs. Davis, who alone contested the suit and who appeals from an adverse judgment.

Appellees pleaded the execution and acknowledgment of the warranty deed, its delivery to J. B. Bond and recordation of same in the Deed Records of Titus County; the execution and recordation of the Busby lease, the development under same, and the oil runs therefrom; and the recordation of the conveyances above mentioned into and out of Geo. W. Bond. They prayed for removal of cloud from title by reason of the recordation of the Geo. W. Bond instruments, for title to the lot and the 1/8 royalty; for appointment of a receiver with authority to collect from the pipe line company the royalties, and to invest same under the orders of the court with all the revenues derived therefrom to be paid to Mrs. Davis during her lifetime, the corpus to be held intact. They did not seek to disturb her use and enjoyment of the life estate. Mrs. Davis answered with demurrer, denial and plea of not guilty. In the first count of her cross-action (the second count is waived) she alleged trespass to try title in statutory form against appellees and Whalen and sought title and possession.

It is admitted that the deed was deposited with Crawford, the notary, after its execution and acknowledgment. The notary, his wife, Mrs. Davis and husband, were present when the deed was executed and left with the notary. The notary died December 30, 1930, and Mr. Davis died prior to 1933. Mrs. Crawford testified that Mrs. Davis stated to Mr. Crawford that "she had already settled with George and Nellie, but had not settled with Ben on some property she had sold, and wanted Ben to have the place and wanted it fixed so that George and Nellie could not get it; that Mr. Crawford told Mrs. Davis she could make her will and she could tear a will up any time if she wanted to change her mind; and she could make a

deed, but when it was put on record it could not be torn up and she could not change her mind after she signed it." Mrs. Crawford detailed a further conversation as to writing the instruments so that Mr. and Mrs. Davis could live upon and use the place until their deaths; and after these explanations and conversations Mrs. Davis told Mr. Crawford she "wanted it fixed so it could not be changed or torn up and to write a deed; that Mrs. Davis did not want George and Nellie to know anything about it for they would not be satisfied with it." The deed was then prepared, read over and explained to Mr. and Mrs. Davis, executed, and acknowledged separately. She heard Mrs. Davis tell Mr. Crawford to keep the deed until it was called for, or something to that effect. Neither this conversation, the foregoing alleged statements made by Mrs. Davis and the notary, nor any other detail included above, were expressly denied by Mrs. Davis. The only testimony given by Mrs. Davis in reference to her execution and delivery of the deed to the notary was, "I told Mr. Crawford I wanted to make a will to Ben, afraid I would drop off, and George and my daughter (Nellie) was gone, and to give that will to Ben when I dropped off."

This deed remained in the Crawford home for a long time, probably six or seven years. There is no direct evidence as to when or to whom Mr. Crawford delivered the deed, but it was filed for record on December 24, 1930, and after its recordation was delivered by the county clerk to J. B. Bond, who paid the recording fee. A certified copy of the deed was used in evidence, the original being missing. After the execution of the deed J. B. Bond returned to Talco where he resided intermittently near or with his mother until his death. The record indicates that J. B. Bond was living in Arkansas at the time the deed was executed. Mrs. Davis testified that she did not instruct Crawford to turn this deed over to any one at the time it was filed for record; never called for it after it was first left with the notary; and never knew it had been recorded or that Ben was claiming the property, until after Ben's death.

It is to be observed that after the deed had been recorded Mrs. Davis and J. B. Bond executed the oil and gas lease. According to the testimony of Busby, he called at Mrs. Davis' home in 1933 to secure a lease on the lot, and was then informed by Mrs. Davis that the lot belonged to Ben and to see him. Mrs. Davis denied that she told Busby that the lot belonged to Ben, and also claims that she did not know Ben signed the oil lease. She said she told Busby to see Ben, "because I can't read and write, and Ben was living with me and I let him tend to my business."

The jury found "that Mrs. Eliza Davis left said deed with W. H. Crawford, with instructions that it be delivered by him to J. B. Bond," and "that it was the instruction of Mrs. Davis that such deed should not be delivered to J. B. Bond until her death." Various findings of fact are set out in the judgment, together with recital that judgment non obstante veredicto is entered for plaintiff. These findings will not be detailed for we conclude from the court's findings of fact together with those of the jury that the court decreed as a matter of law that the deed was delivered when it was left or deposited with the notary public by the grantor with her instructions to deliver to grantee, and that title then passed subject to the life estate retained in the deed by the grantor. The decree cancelled the Geo. W. Bond instruments and removed cloud from title by reason of their recordation, and awarded appellees title to the lot and corpus of the oil subject and subordinate to the right of Mrs. Davis to use and enjoy the premises and to receive all the revenues derived from the investments out of the oil runs during the remainder of her life.

This decree to the effect that title passed subject to the life estate is sustained. As stated by the Supreme Court in Henry v. Phillips, 105 Tex. 459, 151 S.W. 533, 536, "The question of delivery of a deed is one of intention on the part of the grantor, and an actual or manual delivery by the grantor in person to the grantee is not essential to pass the title." The statements attributed to Mrs. Davis by Mrs. Crawford as to her reasons and intent in executing the deed in question instead of a will, and of having the reservation of a life estate so incorporated, were not denied by grantor. No contention is made in pleading or evidence that the execution and delivery of the deed was procured by fraud, accident, mutual mistake or undue influence. We

have the manual delivery of the deed with its habendum clause reading, "have granted, sold and conveyed and by these presents do grant, sell and convey unto J. B. Bond, his heirs and assigns forever." indicative of a present conveyance. The jury has found that Mrs. Davis deposited this deed with the notary and instructed him to deliver same to J. B. Bond upon her death.

The court in Henry v. Phillips, supra, passing upon a state of facts wherein the grantor had executed a deed, delivered same to a bank for safe keeping with instructions to its cashier to deliver same to the grantees therein upon the grantor's death, held such manual delivery with such instructions constituted a valid delivery as a matter of law and title then passed. That such act "had precisely the same effect as if he had made and delivered the deed to the grantees, conveying them the fee, reserving to himself in the deed the use and enjoyment of the land for and during his natural life." Substantially to the same effect, involving delivery to a third party, see Slowey v. Hunt, 108 Misc. 222, 177 N.Y.S. 505, wherein one of the grantees died after delivery and prior to the death of grantor; Johnson v. Cooper, 123 Kan. 487, 255 P. 1112, wherein the grantor later secured and destroyed the deed; Peterson v. Bisbee, 191 Mich. 439, 158 N.W. 134, and authorities therein cited, where the deed was burned nine years later in the presence of grantor; Chambers v. Chambers, 227 Mo. 262, 127 S.W. 86, 87, 137 Am.St.Rep. 567, wherein a father sought to cancel his deed to his daughter after its delivery; Hudson v. Hudson, 287 Ill. 286, 122 N.E. 497, wherein a father later secured and destroyed his deed after delivery and attempted to dispose of the property by will; Earl v. Munday, Tex.Civ.App., 227 S.W. 970, writ refused, where after delivery the property is attempted to be disposed of by will; Griffis v. Payne, 92 Tex. 293, 47 S.W. 973. See also Davis v. Zeanon, Tex.Civ.App., 111 S.W.2d 772; Temple v. City of Coleman, Tex.Civ.App., 245 S.W. 264, 267; Burke v. Adams, 80 Mo. 504, 50 Am.Rep. 510.

■ Mrs. Davis would have made favorable answers to two questions propounded by her counsel, reading: "Was it your intention at that time to sign a paper that would give this property, or any part of it, to Ben's children if Ben should die before you did?" "Was it your intention and purpose when and after you signed that paper to put it beyond your control to change it if Ben Bond should die before you did?" The action of the court in sustaining the objection and refusing to permit her to answer same is sustained. In words of the Supreme Court of Illinois in Hudson v. Hudson, supra, [287 Ill. 286, 122 N.E. 501], applicable here, "A subsequent change of intention could not affect the delivery thus completed, and even a mental reservation of the testator contrary to that expressed by his words and deeds, existing only in his own mind, would not invalidate the delivery effected by his acts and the words actually used." See also Lott v. Kaiser, 61 Tex. 665. "This intention is to be inferred from all the acts and declarations of the grantor. As has been many times said, a deed may be delivered by words without acts, or by acts without words, or by both words and acts." 16 Am.Jur. p. 505; Burke v. Adams, supra. Bearing upon this issue see also Henry v. Phillips, supra, and Earl v. Munday, supra.

■ In the decree, the proceeds of the ⅛ royalty received and to be received were impounded in the receiver with authority under future orders of the court to invest same in revenue-bearing securities. The receiver was directed to pay to Mrs. Davis during her lifetime all the revenue received from such investments, and to appellees the corpus upon her death. To this, appellants assert under the fourth proposition: "If it should be assumed that no competent evidence was excluded and that the evidence admitted shows conclusively that the deed from Mrs. Davis to J. B. Bond was delivered, nevertheless Mrs. Davis is entitled to all the oil royalties, because she is a conventional life tenant as distinguished from a legal life tenant, and her estate is therefore not impeachable for waste."

In this connection reference is made by appellant to an expression in Swayne v. Lone Acre Oil Co., 98 Tex. 597, 86 S.W. 740, 69 L.R.A. 986, 8 Ann.Cas. 1117, to the effect that at common law a conventional life estate was not impeachable for waste unless expressly made so by the conveyance. This expression was dictum and not necessary to the disposition of that cause. Tiedman on Real Property, 1924 Ed., p. 73, in the treatment of this

subject states that in early times above rule applied, but subsequently, by the Statute of Marlbridge, enacted A. D. 1267, the disability of committing waste was made an ordinary and general incident to all kinds of estates for life and for years. And the statute of Glouchester, enacted A. D. 1278, imposed upon the party committing such waste a penalty of treble damages with forfeiture of the estate. See Moore v. Townshend, 33 N. J.L. 284. Evidently for many centuries prior to the enactment of Article 1 of our Revised Civil Statutes conventional life estates were impeachable for waste. Cooley's Blackstone, Vol. 2, Sec. 120, so treats the subject; likewise Tiedman on Real Property, supra. In Summers Oil & Gas, Permanent Ed., Vol. 1, page 88, § 33 it is stated: "Tenants created by acts of party, by deed, devise or contract for life or years, have been held under a duty not to take oil or gas, as against the remainderman or reversioner," citing decisions from several states. As stated by Mr. A. W. Walker, Jr., in the 6th Texas Law Review, page 142: "* * * practically all of the states have allowed an action on the case for waste, citing 1 Tiffany, Real Property, 1920 Ed. p. 981, and have permitted recovery against all tenants regardless of the method of creation of their estate." See also 21 C.J. p. 948, Sec. 87.

The land was not under lease nor had it been devoted to mining purposes prior to the creation of what may here be termed a conventional life estate. Here the oil and gas in place was a part of the realty. The warranty deed into J. B. Bond and his heirs, above detailed, contains no provision which retains or reserves to the grantor any corpus of the realty. Under the facts in this case and authorities cited, it is concluded, in the absence of the Busby lease, that the life tenant, Mrs. Davis, would have no authority to produce oil from this land, for such act would be an appropriation of a part of the corpus of the estate. Texas Co. v. Daugherty, 107 Tex. 226, 176 S.W. 717, L.R.A.1917F, 989; Amarillo Oil Co. v. McBride, Tex.Civ.App., 67 S.W.2d 1098; Blakley v. Marshall, 174 Pa. 425, 34 A. 564; Williamson v. Jones, 43 W. Va. 562, 27 S.E. 411, 38 L.R.A. 694, 64 Am.St.Rep. 891; 21 C.J. p. 947.

The provisions in the oil lease are not attacked. The lease is silent as to division of the royalty payments. The decree entered is in keeping with above conclusion and with the decree in Swayne v. Lone Acre Oil Co., supra, where a legal life estate was involved. Appellant's fourth proposition is overruled.

The first proposition has been considered and is overruled.

The judgment is affirmed.