A. J. HYNDS et al., Appellants, v. GEORGE HYNDS.

Division One, December 6, 1913.

1. PLEADING: Motion to Strike Out Cross-Bill: No Term Bill of Exceptions: Review. Any error committed by the trial court in overruling plaintiff's motion to strike out a part of defendant's amended answer filed at the close of the evidence, such part being what defendant denominated a "cross-bill," cannot be considered on appeal, if the motion to strike out was made and ruled on and exceptions saved at one term of court, at which no term bill of exceptions was filed and no leave granted to file one, and the decree was entered and bill of exceptions under leave was filed at a succeeding term in which plaintiff undertook to preserve its exception to the ruling made at the preceding term. Where an exception is necessary to save a ruling for review, the exception must be preserved by a bill filed at the term the ruling is made, or leave must be taken at that term to file the bill subsequently.

2. ———: When Exception Necessary. Cases may arise where the motion to strike out will fill the office of a general demurrer, and in such cases an exception to a ruling on the motion is not necessary; otherwise, an exception is necessary. If the motion to strike out embraces matter appropriate to a mere motion, and no exception was preserved, it will not be considered on appeal; if it contains matter pertinent to a general demurrer and to a motion to strike out, and no exception was preserved, so much of it as is appropriate to a general demurrer will be considered, and that part pertinent to a motion to strike out will be disregarded.

3. ———: Amendment After Evidence: Motion to Strike Out. The right to amend a pleading before judgment to conform it with the proof is guaranteed by statute; and if the opposite party asked no terms when the amendment was made and if the proof did not have the probative force to warrant a decree on the amended answer, then no harm was done to appellant by overruling his motion to strike out the amendment, and he has lost nothing by failing to preserve his exception to that ruling, for the question of the sufficiency of the evidence to sustain the decree is open for consideration on the merits, and is not to be decided on a motion to strike out the amendment.

4. ———: Mingling Matters of Demurrer and Motion. To mingle matter of demurrer and matter appropriate to a motion in one pleading is unscientific, and disturbing in an effort to arrive at justice on the merits.

Hynds v. Hynds.

5. ————: ————: **Quieting Title: Cross- Bill.** Where plaintiff has brought his suit in ejectment, whether or not defendant in his answer can set up a defense by way of an action to quiet title, and also a cross-bill—in other words, whether or not there can be a cross-bill when there is no original bill—is discussed but not decided.

6. **ADVERSE POSSESSION: Cotenants: Not an Issue: Resulting Trust.** To establish adverse possession between cotenants there must be such outward acts of exclusive ownership by the cotenant in possession as to impart notice to the other cotenants that the possession is adverse. Actual notice is not necessary; but a mere mental intention to claim adversely, unaccompanied with acts open, clear and unequivocal, will not alone do; for, unity of possession is of the very essence of tenancy in common, and the possession of one is presumptively the possession of all, and that presumption must be rebutted by the adverse claimant. But that rule is not material or pertinent, where the party does not claim title by limitations, but as the sole beneficiary of an executed resulting trust.

7. **EXPRESS TRUST: Gift: Not Pertinent: Beneficiary of Father's Estate.** Where defendant claims that his mother as administratrix of his father's estate appropriated the net proceeds of the personal estate and took the title in her own name, and afterwards executed the resulting trust arising in his favor under the recognized doctrines of equity pertaining to such trusts, by turning over to him the land as his distributive share of his father's estate, the question of whether an express trust can be established by oral agreement, and the question of whether the evidence is of that direct and positive character necessary to establish a gift in land, are afield, and a determination of them does not reach the issue.

8. **RESULTING TRUST: Land Purchased by Administratrix with Heir's Money.** Where the administratrix assumed to handle and deal with the personal estate of her deceased husband as her own, and invested the money arising therefrom in lands in her own name, a resulting trust arose in favor of the intestate's heirs and in such ratable proportion to each as each contributed the purchase money.

9. ————: ————: **Cotenants Nevertheless.** But although a resulting trust arose in favor of the five children in the land purchased by the widow in her own name with the estate funds, one of them cannot claim a tract so purchased to the exclusion of the other four, unless he proves that a settlement was made with the other four of such a character as bars them from asserting any interest in the land, or that they received from her an amount nearly equal to the share that was coming to them, in other lands or money, or both.

Hynds v. Hynds.

10. ———: ———: Long Acquiescence: Sons. Long acquiescence by sons *sui juris* in some domestic arrangement made with them by their mother, who used the money of her deceased husband's estate to buy land for them, and other lands in her own name, of which she died seized, is not without significance in determining whether another younger son has a resulting trust in the lands so seized to the exclusion of them; and if the evidence shows that they received an amount, in land or money, equal or nearly equal to their share in their father's estate, and the younger brother received nothing, and the situation is confused and the probate records are lost or destroyed or never existed, they will not be permitted to further share in the land remaining, for they are not supposed to drive a close bargain with their mother, and are partly to blame for the loose and unbusinesslike manner in which she handled the funds of the estate.

11. ———: ———: ———: Daughter. But not so with a daughter who was a minor at the time her father died, and married while a ward under guardianship, and is shown to have received only a small portion of her share, and the last probate court record shows only a settlement, by her mother as her guardian and curator, was filed and continued.

12. ABSTRACT: Equity: Omission of Exhibit: Excuse. In an equity case all the testimony should be brought up by appellants. But where appellant's counsel, upon being served with a copy of respondent's brief complaining that the abstract does not contain an exhibit called for by the bill of exceptions (in the words, "The clerk will here copy"), prepared, served and filed a brief in which they undertake to show that respondent's counsel produced the paper at the trial and then took charge of it, and in making up their abstract they searched the records of the court to which it belonged, and failing to find it they then demanded it of respondent's counsel, and were told that they knew nothing about it, and to that showing no counter-showing is made by respondent's counsel, appellant is entitled to whatever force there is in his showing as an excuse for the nonproduction of the paper. And in this case the absence of the exhibit, though important, is not an insurmountable barrier to a proper disposition of the case.

13. ———: ———: ———: Rules: Suspension. Rules of court are but a means to accomplish the ends of justice, and it is always in the power of the court to suspend them or to except a particular case from their operation, whenever the purposes of justice require it.

Appeal from Adair Circuit Court.—*Hon. Nat. M. Shelton,* Judge.

REVERSED AND REMANDED.

*J. M. McCall, P. J. Rieger* and *Joseph Park* for appellants.

(1)  The law is well settled that to establish adverse possession in one cotenant against another, there must be such outward acts of exclusive ownership as to impart notice to the cotenant that an adverse possession is intended.   Misenheimer v. Amos, 221 Mo. 362; Benoist v. Rothschild, 145 Mo. 408; Waifield v. Lindell, 30 Mo. 282; Huston v. Huston, 139 Mo. 236. The evidence conclusively showed that Parmelia Hynds had been in adverse possession since 1858.   The amended answer in effect pleads that she was a trustee for defendant and his answer clearly seeks to charge the land with a resulting trust.   Equity follows the law in applying laches and limitations.   Burrows v. Cook, 215 Mo. 496; Steuton v. Thompson, 234 Mo. 7; Rutter v. Carothers, 223 Mo. 631.   A resulting trust may be barred by limitation.   Burdett v. May, 100 Mo. 13; Defter v. McDonald, 196 Mo. 399; McKee v. Downing, 224 Mo. 115.   (2) To prove an implied or resulting trust it is not sufficient to show money in the hands of the trustee but the trust money itself must be traced into the land.   Phillips v. Overfield, 100 Mo. 466; Huelteman v. Vasselman, 38 Mo. 590; Reed v. Painter, 129 Mo. 682.   And the proof to establish it must be so clear, strong, unequivocal as to banish every reasonable doubt.   Burdett v. May, 100 Mo. 13; Johnson v. Quarrels, 46 Mo. 423; Forrester v. Scooville, 51 Mo. 268; Ringo v. Richardson, 53 Mo. 385; Kennedy v. Kennedy, 57 Mo. 73; Gillespie v. Stone, 70 Mo. 505; Overshiner v. Britton, 169 Mo. 352; Dexter v. McDonald, 196 Mo. 399; Smith v. Smith, 201 Mo. 547; Philpot v. Penn, 91 Mo. 38.   In ejectment it is unnecessary to plead the Statute of Limitations as it operates on the right to the land and vests title in the adverse occupant. The operation of the statutes may be shown under

the general allegations of the petition or general denial in the answer. Nelson v. Broadbeck, 44 Mo. 596; Fulkuson v. Mitchell, 82 Mo. 13; Holmes v. Kring, 93 Mo. 452; Stooker v. Green, 94 Mo. 280; Fairbanks v. Lang, 91 Mo. 628.

*Higbee & Mills* and *Campbell & Ellison* for respondent.

(1) It was shown by the record that the settlement, known as "defendant's exhibit A" and a deed introduced and read in evidence are not preserved in the bill of exceptions. Such failure to preserve all the evidence is fatal to a review of the evidence in this court. McCulley v. Dewitt, 163 Mo. 306; McKinney v. Norcutt, 114 Mo. App. 146; Moore v. Harmes, 123 Mo. App. 34; Davies v. Boyers, 140 Mo. App. 592. (2) It is conclusively shown by the evidence that at the time of the death of John Hynds, his widow, Parmelia Hynds, owned no property. That all of the property transferred to their children was purchased with the trust funds which came into the hands of the widow while she was acting as administratrix and guardian. That many years ago she had settled with each of her children by segregating the interests of each in said estate, and setting apart to them their respective interests. That after the settlements with those children there remained in the estate only the lands involved in this controversy. It is conclusively shown, in fact, tacitly admitted, that the defendant never received anything from the estate except the lands involved in this controversy. When a guardian, curator, or administrator purchases property with trust funds, a trust results in favor of the ward or beneficiary. Patterson v. Booth, 103 Mo. 405; May v. May, 189 Mo. 485; In re Ferguson Estate, 124 Mo. 574. The conceded fact that Parmelia Hynds owned no property at the time of her husband's death and that she afterwards acquired title in her own name to various tracts

of land, is in itself sufficient evidence to show that the lands were bought with trust funds. Prewitt v. Prewitt, 188 Mo. 675. The plaintiffs do not attempt to explain the reason for the long continued silence, except that some of them said it was a "matter of such little importance that they never thought about it." Plaintiff's claim is stale. Bliss v. Prichard, 67 Mo. 181. (3) The appellant's brief is devoted to a discussion of the law relating to "gifts" by aged and feeble persons, and the law relating to express trusts. Neither of said legal propositions have any place in this case. There is no claim on the part of the defendant that would bring the case within the rule relating to express trusts. The defendant claims the property because the same was purchased with trust funds, of which he was the beneficiary. The defendant does not claim that the land was a "gift" to him. That is he does not claim that it was a "gift" in the sense of a donation. His claim in this regard is that his brothers and sister had received their distributive shares of his father's estate and that the lands involved in this controversy were segregated and set apart to him as his part of the estate. That said lands were not donated to him, but were given to him as his part of the estate; given because he was the owner. All of the estate, except said land, had been distributed to the other children and he took said lands merely as his distributive share in the estate.

LAMM, J.—Ejectment in the Adair Circuit Court.

From certain evidence (in which a "partition suit" is referred to) we conclude plaintiffs had sued defendant at some prior time for the partition of certain lands in Adair county, that therein defendant claimed adverse possession and that thereupon such proceedings were had in that suit that plaintiffs were either cast or that the cause was abated until plaintiffs brought ejectment and tried out title.

At any rate, in March, 1909, plaintiffs sued in ejectment to recover three tracts of land in Adair county, for convenience here designated as A, B, and C. Tract A is the south half of the southwest quarter of section 12, township 61, range 15, except the right of way of the Wabash railroad. Tracts B and C are two outlying tracts of timberland that need no description.

Plaintiffs aver they were lawfully entitled to possession on a certain day in October, 1899. They lay ouster as of May 18, 1908.

Defendant answered with a general denial, following that by the averment that he was the owner in fee and in possession as such, claiming title; but that plaintiffs claimed some interest adverse to defendant's title. Thereupon the answer goes on to pray the court to ascertain the respective titles, estates and interests of plaintiffs and defendant, and adjudge the same severally, and finally determine all the rights and claims of the parties and adjudge and decree defendant to be the absolute owner, that plaintiffs and neither of them have any title, and for all proper equitable relief.

(Note: The pleader evidently undertook in his answer to state a cause of action under former section 650 to determine and quiet title—now section 2535, Revised Statutes 1909—and this by way of defense, without reference to a counterclaim.)

Presently, at the same term, plaintiffs filed their motion to strike out all that part of the answer following the general denial for sundry and divers reasons, but as the motion was overruled and no assignment of error is made on that ruling, it is put away from us.

At the same term plaintiffs filed their reply in which, after denying allegations of new matter, they more fully exploited their alleged title, claiming as heirs (children and grandchildren) of one Parmelia Hynds, who died intestate seized as owner of the prem-

ises and in possession at the time of her death, to-wit, in 1898, and averring that defendant was also an heir (child) of Parmelia and was devisee of another deceased heir, one Rit Hynds—also a child; that as such heir and devisee defendant was entitled to an undivided two-fifths of the land as tenants in common with plaintiffs; that two of plaintiffs, A. J. Hynds and Jennie Mahaffey, were each entitled to a one-fifth as such tenants, and that the other plaintiffs, naming them, were the widow and children of a deceased heir of Parmelia, to-wit, William Hynds, and as such entitled to his share, to-wit, an undivided one-fifth as such tenant. After restating the averment of the petition that defendant wrongfully withholds possession, etc., plaintiffs renew their prayer for judgment.

At the next, to-wit, the January term, 1910, on the trial at the close of the evidence, defendant filed an amended answer. This amended answer was a replica of the former with the addition of what the pleader called a "cross-bill." In a nutshell the cross-bill set forth these averments: That in 1858 John Hynds died intestate in Adair county, leaving a widow, Parmelia, and certain children, one of whom was defendant, then aged two years, and William, A. J., and Richie (Rit) and Jennie Mahaffey; that Parmelia was appointed administratrix, took possession of the estate, to-wit, personal property of the value of $2500; that with the money and assets in her hands as such administratrix she bought the land described in the petition, taking title thereto in her own name; that afterwards on dates and in ways mentioned in the answer, she settled in full with all the children of John Hynds for their respective distributive shares in his estate with the exception of defendant and that the distributive shares so paid to said children respectively were accepted in full settlement; that there remained only the described real estate, so paid for out of said trust funds in Parmelia's hands as administratrix; that defendant never

received any part of his distributive share of his father's estate; that the land in question did not exceed in value his distributive share; that long before the death of Parmelia she promised to set apart and convey to defendant, as and for his distributive share, said land; that defendant accepted the same; and that "therefore (therefrom?) until the present time defendant had had full and exclusive possession of the premises as his own, claiming title thereto, paying taxes thereon and exercising all the usual acts of ownership thereover." Wherefore, defendant says, that by reason of the premises he is the owner of all three tracts and prays the court to adjudge and decree to that effect and that plaintiffs and each of them be divested of all title and claim of title thereto, etc.

On that amended answer coming in, plaintiffs filed a motion to strike out that part of it purporting to be a cross-bill for the reasons (1) that there was no evidence authorizing the filing of said amended answer; (2) that the part objected to is contradictory to defendant's original answer; (3) that it is inconsistent with defendant's said original answer; (4) because the cross-bill does not state facts sufficient to constitute a cause of action; (5) and does not state facts sufficient to constitute any claim or right to the real estate; (6) and was not filed at the time it purported to be.

That motion was overruled. Plaintiffs excepted in a record entry, but filed no term bill of exceptions. Thereupon the court took time to consider and the cause was continued to the next regular term.

At the next term the cause came on for final disposition and it was decreed that defendant was the owner of A; that title to A be vested in him in fee to the exclusion of plaintiffs or either of them; tracts B and C belong to defendant and plaintiffs, the other living children of Parmelia and John Hynds, and the heirs of their dead child, William, as tenants in common, to-wit, an undivided one-fifth to defendant as

such child, the same to defendant as devisee of his deceased unmarried brother, Rit (who died testate), one-fifth to Jennie Mahaffey (born Hynds), one-fifth to A. J. Hynds, and another fifth to the other plaintiffs, the children of William Hynds deceased—an undivided one-forty-fifth to each child, subject to the dower of William's widow. The costs were ordered paid by plaintiffs and defendant, half and half.

Thereupon plaintiffs appeal in due time and on such proper steps as bring here for review certain questions. Defendant abides the decree.

Sufficient of the record and proof to determine points raised will appear in connection with a consideration of the point itself.

We make the following prophylactic observations as a foreword: By unhappy inadvertence the cause on some phases was loosely tried on both sides. Both sides resort to the *nebular hypothesis* and, to borrow a chimney-corner figure, in sewing seams dropped stitches. Shadows lurk in the record which experienced and able counsel (as here) could have cleared away, and witnesses were cross-examined on documents not preserved in the record. So, the brief of appellants violates that paragraph of our rule fifteen requiring a statement, in numerical order, of the points relied on, together with a citation of authorities appropriate under each point, and all this to be separate and apart from the argument and discussion of authorities. Handicapped with such unnecessary troubles, we do the best we can with the record. By sifting and winnowing we will formulate propositions in our own way.

I. *Of the motion to strike out.*

It is argued for appellants that the motion to strike out part of the amended answer should have been sustained. Respondent's counsel pass the point in silence. In fact there is no set line of battle in

briefs, or steady measuring of swords. When appellants assert, respondent does not answer, and *vice versa.* In our opinion the assignment must be ruled against appellants, because:

(a) The motion to strike out was made and ruled and the exception saved at one term of court whilst the decree was entered and the bill of exceptions was filed under leave taken at a succeeding term. No term bill of exceptions was filed, and no leave granted to file one at the term the exception was taken, but appellants undertook to preserve the exception in the record entries made at the time and in a bill filed at the succeeding term. Such course does not save the exception where one is necessary to a review. Revised Statutes 1909, section 2029 roads: "Such exceptions may be written and filed at the time or during the term of the court at which it is taken, or within such time thereafter as the court may, by an order entered of record, allow," etc.

(b) It has been ruled that an adverse ruling on a general demurrer may be reviewed without an exception. It has been ruled that a ruling on a motion to strike out is preserved only by an exception. But it has also been ruled that cases may arise where a motion to strike out fills the office of a general demurrer and, under guarded limitations, may be treated as such. But it is obvious that this motion to strike out (while it had pertinent matter to a general demurrer) covered other grounds appropriate to a mere motion, hence both the motion and the exception should have been saved in a bill filed at the term, or on leave granted, in order to bring up those grounds of the motion, separable from the general demurrer. We have been so lately over this ground that we will not restate the learning on the point. The curious may consult Shohoney v. Railroad, 231 Mo. l. c. 148 et seq., and cases therein cited; Interstate Ry. Co. v. Mo. R. & C. R. R. Co., 251 Mo. 707, and cases therein cited.

We rule, therefore, that the motion to strike out and the exception to the ruling thereon are not here for review except insofar as the motion is a general demurrer. This disposes of these grounds of the motion directed to inconsistency of the cross-bill with the original answer, its being contradictory thereto, the lack of evidence warranting the amendment, and its being filed out of time. Our ruling on this technical ground is softened to us for the reason that we can see no substance on the merits. There was no inconsistency, no contradiction, no untimeliness. The right before final judgment to amend the pleadings to agree with the proof is safeguarded by statute. [R. S. 1909, sec. 1848.] Plaintiffs asked no terms when the amendment was made and if the proof did not have the probative force warranting a decree on the amended answer, as argued, that question is open on the merits and is not to be decided on a motion to strike out the amendment.

(c) Taken as in part filling the office of a general demurrer, it will be observed the motion did not strike at that part of the amended answer wherein the pleader makes averments invoking the aid of old section 650 to quiet title; and, if it did, the generality of the language used in that behalf in the answer was well enough. [Huff v. Land & Imp. Co., 157 Mo. 65.] The motion merely attacks the cross-bill, *eo nomine*. But in their brief they do not point out the absence of any specific averment essential to the statement of a cause of action in equity. An appellate court has no call to be astute to find what appellants neglect to put their finger on. While the cross-bill is so concise as to be scant and a little vague, yet we are not prepared to say that, liberally construed, it does not state a cause of action.

In leaving the whole matter, we make the following further observations: To mingle matter of demurrer and motion in one pleading is an unscientific and dis-

turbing novelty. [McKee v. Downing, 224 Mo. 1. c. 130.] The motion, *inter alia,* raises exceedingly nice points of practice. For instance: Defendant was sued in straight ejectment. Undoubtedly he had the right under our practice act to plead by way of defense, and unite in his answer, "a general and specific denial" with a "statement of any new matter constituting a defense or *counterclaim.*" [R. S. 1909, sec. 1806.] The next section prescribes how the "counterclaim" must arise and amends the very old rule of practice so that now defenses and counterclaims may be such as have been "heretofore denominated legal or equitable, or both." [Sec. 1807.] In Chambers v. Chambers, 227 Mo. 262, plaintiff sued under old section 650 to quiet title, but he interwove into his petition such equitable matter as clearly put the cause into equity. The answer was in two counts, the second a cross-action in ejectment. One question was (p. 273) whether a strictly legal action of ejectment may be grafted by defendant on the stock of plaintiff's suit in equity, looking to the cancellation of a deed and the removal of a cloud upon plaintiff's title. In the instant case we have the converse of that. Plaintiffs sue at law in strict ejectment, presumably driven to that course by an order in the partition suit because of a claim of adverse possession. When they do so, they are met with a defense by way of an action to quiet title under old section 650. May defendant take that course? Furthermore, they are met with a "cross-bill," not designated as a "counterclaim." Must there not be an original bill before there can be a *"cross"* bill? We say neither aye nor nay on those questions, but mark the spot, that we may not be precluded hereafter should such questions of practice be brought here on a record in some other case challenging a ruling.

A main part of appellants' brief is leveled at the ruling on the motion to strike out. Under cover of that general head, as already hinted, they have dis-

cussed questions pertaining to the substantive law of their case, and which, in that view of it, in due course will receive consideration regardless of the irregular classification of matter in their brief, this as a debt due justice.

II.  *Of adverse possession.*

We are furnished with a brief by appellants on the question of what constitutes adverse possession between cotenants. They insist on the proposition that to establish such possession in favor of one cotenant, as against another, there must be such outward acts of exclusive ownership as to impart notice of adverse possession to other cotenants.  Defendant's counsel pass the point in silence. Such silence is tantamount to their concession that the rule is as stated.  Whether conceded or not, such is the rule.  [Allen v. Morris, 244 Mo. l. c. 363 et seq.; Coberly v. Coberly, 189 Mo. l. c. 16 et seq.; Misenheimer v. Amos, 221 Mo. 362.]

Actual notice to other cotenants in that behalf is not necessary.  But a mere frame of mind, a mental attitude, unaccompanied with acts, will not alone do. The laws of men deal with the mere purpose formed in the mind only when the purpose comes into the open by flowering into concrete action in some overt act, or tends to stamp the character of some act in judgment. The laws of Heaven are different.  They search the heart itself with an all-seeing eye, and there see snakes in the grass to be bruised by the heel; *e. g.,* Matt. v:28. Now, unity of possession being of the very essence of tenancy in common, the possession of one is presumptively the possession of all.  The presumption is a rebuttable one, but the burden is on the cotenants seeking to rebut it to do so by cogent proof.  The acts relied on, whether verbal or otherwise, must be open, clear and so unequivocal as to coerce belief.  If they measure up to that severe standard and demonstrate to the world (by their openness and notoriety)

253 Mo. 3

an adverse claim, the cotenant may thereby establish disseizin of his fellows and put himself in the way of finally getting title by adverse possession through mere effluxion of time. But in the instant case respondent does not claim title by limitation, nor that an adverse possession in him flowered and ripened into such title. His claim is that he is the sole remaining beneficiary of a trust fund springing from a resulting trust—a trust fund out of which the other original beneficiaries had received their distributive shares, the residue falling into his lap on equitable principles even as falls an apple from its bough in its due season. True, he had and held exclusive possession for a time. True, he was in possession claiming adversely when the suit was brought. But he uses such possession only as persuasive evidence to show acquiescence on the part of the other heirs of Parmelia and John Hynds in his theory of a resulting trust and a settlement with the other beneficiaries. In view of this contention, we lay aside appellants' proposition of law for use in some other case.

III. *Of an express trust and gift.*

(a) Appellants' brief in part invokes the trite rule that an express trust in land cannot be established by word of mouth. As no express trust is invoked by respondent, the matter is insofar afield that it is not here for judicial disposition. We mention it only to wash our hands of it. We have nothing to do with what is not before us.

(b) The same ruling must be made on their proposition that the evidence is not of that direct, positive and unambiguous character necessary in establishing a *gift* of real estate. The essential and stringent requisites of a gift of that sort are pointed out, *ex industria,* in appellants' brief, and are stressed *arguendo.* Why so? This case cannot break in whole or in part on such question. Respondent is not stand-

ing on a gift, *qua* gift. He asserts no donation—nothing received without money and without price as a gift *inter vivos. Contra,* he claims as of right, within recognized doctrines of equity pertaining to resulting trusts. He supplements that claim by the contention (in aid of it) that the trust was executed by turning the land over to him as his distributive share of his father's estate. Accordingly, we put gifts and express trusts aside.

IV.  *Of a resulting trust.*

Attending to the record on that head, the proof is to this effect: John Hynds died in 1858, intestate, in Adair county, possessed of personalty but seized of no realty. As a settler he had come into the country shortly before with some means, but died before buying land. He left a widow, Parmelia, who survived him forty years, and six children, William, A. J., Rit, Jennie (who intermarried with Mahaffey), Tabitha and George, aged two years. Tabitha died during minority, while under guardianship and unmarried. The record does not show whether an administrator was appointed for her estate or what disposition was made of it. As all parties seem to assume such fact, we shall also assume it was treated as merged in the *corpus* of the general estate. Jennie married while a ward under guardianship. We infer that William was about of age at his father's death. At that time the other children were minors and four of them were minors in 1865, to-wit, A. J., Jennie, Tabitha, and George. Two of the sons, A. J. and Rit Hynds, while minors (aged respectively eighteen and twenty years) enlisted and served as soldiers during the Civil War. At least one of them (A. J.) and possibly the other sent his army pay home to their mother, but whether it was sent home as due to her as surviving parent during their minority or to be held by her as agent or as part of their estate does not appear. Neither does the

amount of the estate of John Hynds positively appear.
We shall have occasion, in due course, to recur to this
phase. On August 4, 1858, it is shown, from a record
produced from the probate office of Adair county, that
Parmelia appeared "in vacation" and filed an affida-
vit of the death of John Hynds and on that date the
record entry shows this: "Letters of administration
are granted to her on the estate of said deceased."
The amount of her bond, the size of the estate, the
character and condition of the assets or the history
of her administration nowhere appear in any subse-
quent entry. Indeed, from that day in August, 1858,
down to the day of trial there is not a shred or thread
of evidence relating to probate proceedings in the es-
tate of John Hynds or her administration except what
may be faintly got, *aliunde,* and by indirection and in-
ference at that. There is testimony that (with the
above scant result) the records in the probate office
were searched for entries relating to the administra-
tion of the estate, but it does *not* appear that any
search was made in the office of the clerk of the county
court for data in this ancient matter (the significance
of which omission will be presently referred to).

The records produced from the probate court also
show the following entries, and no more, relating to
her guardianship: On August 8, 1865, she was ap-
pointed guardian and curator of the four children on
that date remaining minors, to-wit, A. J., Jennie, Ta-
bitha, and George. Her bond was fixed at $5000 and
it was filed and approved.

(Note: By reference to section 22, p. 468, chap-
ter 116, General Statutes 1865, it will be seen that at
that time guardian and curators' bonds were required
to be fixed at "double the value of the estate or inter-
est to be committed to their care." Assuming such
duty was performed by the court, then such entry is
evidence of the fact that the mother as guardian and

curator took into her hands an estate of not more than $2500 belonging to the four minors).

From the same record produced from the same source another record entry was read in evidence, apparently under date of "May 6, 1865," showing that Parmelia was charged with the sum of $2234.96 as assets belonging to said four minors and on that date she received credit of the sum of $876.96 "as per settlement here filed." Maybe the paper presently referred to as "defendant's exhibit A" was this settlement "here filed," but the record is dark on that. It is obvious there is a mistake in either the date of her appointment as guardian and curator or in the date of the entry last above, for the charge, credit and settlement spoken of apparently antedate her appointment. Fifteen years go by and then the following appears under date of August 9, 1880: "Estate of Hynds's minor heirs, Parmelia Hynds, G. and C., annual settlement filed." Why we are left to guess we do not know, but maybe this settlement, and not the other, was "defendant's exhibit A." Another entry, we infer on the same date, reads: "Estate of Jennie Mahaffey, Parmelia Hynds, G. and C., final settlement filed and *continued*." On September 13, 1880, the following entry appears: "Estate of Jennie Mahaffey, Parmelia Hynds, G. and C., final settlement *continued* second Monday in next month."

(*Nota bene*: Under the Constitution existing in 1855, article 5, section 12, it was provided that probate jurisdiction should exist in "inferior tribunals" to be established in each county. Under that constitutional grant of power, exclusive original probate jurisdiction was vested by statute in county courts. [R. S. 1855, vol. 1, p. 534, chap. 47.] There it remained until 1877, except in the city and county of St. Louis and except in counties where, by virtue of local statutes, it was vested in common pleas courts or other named tribunals by special enactment. It is not made

to appear there was any such special act passed for Adair county, but in 1875 the Constitution was made to read so that "judicial power" was vested in "probate courts," article 6, section 1, and by section 34, *ibid,* the General Assembly was required to establish such a court in each county and it was given probate jurisdiction. In 1877, in obedience to that mandate, such courts were established throughout the State by act of the General Assembly in each county, article 5, chapter 23, Revised Statutes 1879, and provision was thereby made for a transfer of those books, "relating solely to the estates of deceased persons, etc.," and guardians and curators from the office of the clerk of the county court over to the probate court, as well as all files and papers. [R. S. 1879, sec. 1191.] It is singular that in the case at bar no attempt was made to show that entries relating to the estates of minors and deceased persons were kept in separate books while the county court had jurisdiction, nor were the records of the county court searched. So that if we assume said statute was obeyed and papers and separate books sent over, yet there is left to be reckoned with the fact that in many counties no separate probate books were kept, but entries anent county business proper and business transacted in county courts anent estates of decedents and minors were intermingled in the same record books.)

The abstract of the record shows that search was made shortly before the trial in the office of the probate court for files and papers relating to the guardianship of Parmelia, but none could be found. Before that, however, one of defendant's attorneys did find a document called "defendant's exhibit A." As a point is made in respondents' brief in relation to the absence of this exhibit from the abstract, and a counter point is made in appellant's reply brief, we shall recur later to that exhibit and the examination of witnesses thereon.

The proof shows that at the death of John Hynds, Parmelia, his spouse, had no property in her own right nor is it shown she acquired any such property since that time independently of the estate. Under the state of law then existing she was entitled to certain personal property absolutely, to her widow's allow-. ances, to dower in the personalty as her distributive share. There is a sour saying, nobody owes a dead-man, a dead man owes everybody—allowing that to overshoot the mark, yet the rule is that when a man pays his debt to nature he does not thereby pay all his debts. Men usually owe debts and die owing them. The doctor levies his toll, the undertaker takes his share. Doubtless John owed and Parmelia paid debts, but this record is as dumb as the deeps on that matter. But there is a glimmer of light in the record, for instance: If we assume that $2234.96 represented the estate of four of the children, then, reckoning from that starting point, the entry is some evidence that the share of each child, minor and adult, was at least $558.74. As the charge was joint so the credit seems to be joint, as the record entry runs. If that supposition be indulged, the share of each minor child would be reduced by the rise of $200 in 1865. If the size of the whole estate be calculated from the share of each minor, it would seem that the estate of John Hynds was between $3000 and $4000. His estate seems to have consisted of horses, etc., but the bulk of it was money. As there were six heirs, if we equalize the widow we would have seven to share in such amount and, by division by seven, it appears that would not be far from the amount she charged herself with for each of the minors.

Parmelia, presently, purchased one forty of tract A for $750. This purchase was made soon after her appointment as administratrix, to-wit, on September 21, 1858. On the first day of that same month she bought either tract B or C for $100, and on the twenty-

first of September in the same year she bought the
other timber tract for $125. In April, 1864, she bought
the other forty of tract A for $675. She seems to
have at once adopted the plan of loaning out the money
of the estate in her own name; for we find notes taken
in that way, and in some instances the collection there-
of was enforced by suit and judgment. At a time left
dark and for a consideration left dark (it must have
been before 1863) she purchased another eighty acres
of land lying close to tract A; for in that year she
conveyed it to her son William. At sometime before
1868 (also left dark) she bought a lot in Kirksville,
for we find in that year she conveyed that lot to her
son A. J. for $800. He paid her no money. In 1866
one Kirby conveyed seventy acres close to tract A to
Rit Hynds and the proof is that the mother paid much
the larger portion of the money for this purchase,
the entire consideration being $1400. Said deed made
to William Hynds showed a consideration of only $150,
but the proof is that tract A and these other lands
ran at about the same value and it is not clear that
William paid his mother any cash for the land, or if he
did pay the $150 it was not the true value, but must
have been boot or the difference in some adjustment.
William died a year after his mother, to-wit, in 1899.
His widow, Julia, who married William after the con-
veyance, gives her impression, in a deposition taken
two generations afterwards, from talks that she heard
between William and his mother or with either or both
(and that is left dark) that he got this land and "a
piece of money" for staying at home and taking care
of the family after his two brothers had enlisted in
the army, but the proof does not show that the mother
had the wherewithal to pay him, except out of estate
money, and there is evidence that William received as
much as $450 in cash from her at another time and
gave her a receipt, presumably as administratrix.

To sum up the matter, we can make nothing out of the record except that the mother assumed to handle and deal with the estate as her own, invested it in tract A and other real estate in her own name, and made loans on the same basis. Under such circumstances it is a well-settled equitable principle that a resulting trust arises in property so purchased in favor of those whose money is so used and in such ratable proportion to each as each contributes purchase money. [Stevenson v. Smith, 189 Mo. 1. c. 466; In re Ferguson's Estate, 124 Mo. 574; Patterson v. Booth, 103 Mo. 402; May v. May, 189 Mo. 485.]

We hold, then, that tract A was purchased with money belonging to John Hynds's estate, and that a resulting trust arises on that fact in favor of his heirs.

Such holding brings us to the deciding questions stated in the next paragraph.

V. *Of a settlement with the other heirs (and herein of "defendant's exhibit A").*

Attending further to the proofs, there was testimony tending to show as follows: Defendant received no share in his father's estate. He and his brother Rit lived on tract A with their mother and farmed it in partnership with Rit's seventy. This for many years, the other children living away, some close by and others not so close. The original house on A was of logs. One of two or more rooms of frame was built by Rit, George helping. At first Rit paid the taxes, but for a few years before his mother's death and continously thereafter George paid them. The land was assessed during her life to her and after her death to the Parmelia Hynds Estate. Declarations of the mother to the neighbors and visitors were to the effect that she had settled with all the heirs except George and that the real estate she owned represented his share. These statements were begun in the eighties and continued

on down to her death. They were not made in the presence of, nor brought home to, any of the other heirs. There is no proof indicating she intended to wrong any of her children, yet the entire absence of business form in dealing with the estate and failure to settle in court and get a legal acquittance is not persuasive that settlements were made with all of them standing the test of the law. Neither was there evidence of any probative force that any complaint was made by the other heirs or demands for more than they had received. Apparently she kept no books of accounts, and what she knew, or believed she knew, was alone preserved in the leaking cup of human memory.

After the mother died in 1898, George and Rit, bachelors both, continued to live on the farm, renting it out, farming both pieces of land in partnership, collecting the rent, paying the taxes, all this to the knowledge and acquiescence of the other heirs, and George considered himself the owner. He seemed to have been a dilatory man, not alert or assertive, once some given to liquor and hobnobbing with cronies in a near-by village, but a good worker, beloved by his mother, and if he noised his exclusive claim of ownership about in the neighborhood, it is faintly shown, if at all. The notoriety of his claim seems to have arisen from the statement of his mother. The proof shows conclusively that the old lady was willing and ready, more than once, to make a deed to George, that she insisted on his getting a justice of the peace and having the business attended to, but he procrastinated and dallied and his mother died without executing the deed. After a few years Rit also died leaving a will, whereby George became devisee of Rit's seventy. The record does not show that George ever claimed to his brothers, A. J. or William, or William's heirs, that the real estate was his, until shortly before he was sued. On the other hand, none of them made any claim before

or after the mother's death until they sued over ten years after her death. Rit's will to George is exploited in briefs and may have been the spur to action. Mrs. Mahaffey, herself a widow for several years, testified that she had conversations with him, we think after the mother died, in which he told her that she and he were entitled to the estate left by their mother to the exclusion of the others. These conversations are not denied. There is testimony that Mrs. Mahaffey received $110, and that her receipt was made out to her mother for that amount, though the receipt (exhibited in court) was not offered in evidence.

A. J. Hynds testified Mrs. Mahaffey received nothing, but on being shown the receipt admitted it was genuine. In whose custody this receipt had been does not appear.

At the trial a paper was produced by defendant's attorneys, together with a copy thereof made by them. This copy was offered and read in evidence and marked "defendant's exhibit A." The bill of exceptions makes the usual call for an exhibit (viz., "the clerk will here copy") but the abstract of the record does not contain it or the substance of it. As we read the abstract there was some question about the admissibility of the document. The trial judge held the original in his hand at the time and the verity of the copy was disposed of by his suggestion that a comparison could be made *instanter* with the original. That view seems to have been acquiesced in. Another objection made was that the original document was not signed by Parmelia Hynds or by anyone. There is no testimony as to whether it bore the file marks of the court having probate jurisdiction, but one of defendant's attorneys testified that in examining the records he got it in the probate court as a document lodged there and pertaining to the administration of John Hynds's estate and the curatorship of the estate of the minor heirs, and found "among the papers." From references made

to this paper during the examination of other witnesses, it is apparent that it related to both these estates and it possibly was, or purported to be, the paper before the county court at the time the guardian was charged with $2234.96 in assets belonging to the minors and received a credit of $876.96 ''as per settlement here filed.'' Or it may have been the annual settlement filed August 9, 1880. If that was a genuine settlement marked and filed or shown to be an ancient document belonging to the files of that guardianship, it was of importance, and the fact that it was admitted as evidence would seem to indicate the court thought it was properly vouched for. Attorneys for respondent complain of the absence of the paper and cite us to a line of cases holding that in an equity case all the testimony should be brought up by the party seeking a reversal. That is the rule of practice. So, too, runs our court rule number seven. When appellants' counsel were served with respondent's brief making that contention, they prepared, served and filed in this court a brief in reply in which they undertake to show that respondent's counsel produced the paper at the trial, then took charge of it and that in making up their abstract for this court they searched the probate records for the paper without avail, that they then demanded it from respondent's counsel who were the last known custodians of it, and were told by them that they ''knew nothing about it.'' No countershowing is made by respondent and whatever force there is in such showing, as an excuse for the nonproduction of exhibit A, appellants are entitled to.

Defendant in his answer avers (and took the laboring oar in proving) that full settlement was made by Parmelia with all the distributees of the estate, that is, the beneficiaries of the trust fund, except him and that the lands in question did not exceed his share.

As pointed out in the preceding paragraph, the probate record shows she filed a final settlement as G.

and C. of Jennie Mahaffey. But the same record shows it was *continued* twice and at that point the curtain falls and the lights are put out. So in regard to her other wards.

On such summarized record, the questions are:

First, did defendant prove the allegation of his answer that a settlement was made with the other beneficiaries of the trust fund?

Second, is the absence of ''defendant's exhibit A'' an insurmountable barrier to reversing that part of the judgment in favor of defendant?

As I have more than once taken occasion to say, it is an anxious and delicate task to reconstruct ancient matters with fidelity and in just relation and true perspective when some of the actors are dead; when papers are lost or destroyed; when memory, the main reliance, is twisted by self-interest or family quarrel or dulled by the flux of time; when conclusions (as wishes father to the thought) usurp the office of facts; when parties did not deal with each other in correct business form, but loosely under the close and tender confidences of the domestic relation and not at arm's length under the safeguards of a due course of business. But doing the best possible, I am of opinion that both those questions must be answered in the negative. This, because:

(a) If we had not to reckon with the daughter, Jennie Mahaffey, we would be inclined to hold that all the heirs, save George, were settled with. This in spite of the shadow in the record. Each of the sons received land and money save him. They were their own men for well-nigh half a century, *sui juris,* and their long acquiescence in some domestic arrangement evidently made with them is not without significance. Besides that, the amount they each received was so nearly equal with each other and (closer home) was so nearly equal to the share that apparently was coming to each of them out of their father's estate at the time

theirs was received, that reason points her finger to a settlement. In such situation the maxims apply: Equality is equity. Equity, when the facts allow, will take that as done which should have been done. Moreover, these sons, in nature, are not to be supposed to drive a close or sharp bargain with their mother, but to allow what happened, viz., an equitable adjustment in view of a confused situation, they, doubtless, were partly to blame for. The mother would naturally turn to them for counsel, and cannot, now that she is dead and her lips sealed, be held wholly in fault for a slipshod business course.

(b) But when we turn to Jennie Mahaffey the situation changes in all the above respects. She was a ward, under coverture, received no land, presumably was not her mother's adviser and lived some distance away. There is a wry saw in Latin running thus: The absent get nothing. And another in the vernacular: Out of sight, out of mind. But no chancellor allows either in measuring out equity. She received, on the proof, $110. When her mother filed a final settlement with her it was not approved but was continued and so it remains to this day. What was in it? Did it show her curator indebted to her? That is the customary fact in such tentative settlement. Did the ward receive notice of it? Was her acquittance attached? If so, would it not have been approved? We look on the continuance as a fatal obstacle in the way of any assumption of settlement with her at that time and there is nothing to show the matter came up anew. We must assume there was a lion in the way of the final settlement and discharge, else what was begun would have been carried out. Defendant's admission that she had a share in the estate with him weighs heavily against his claim of sole ownership.

We hold, then, that defendant did not show that Jennie Mahaffey received her share of the trust fund,

and that the chancellor erred in his decree in that regard.

(c) As to the absence of "defendant's exhibit A," we say this: The rule of this court being that in an equity case all the testimony must be brought up, that rule must receive a reasonable construction. "Rules of court are but a means to accomplish the ends of justice, 'and it is always in the power of the court to suspend its own rules or to except a particular case from their operation, whenever the purposes of justice require it.' [United States v. Breitling, 20 How. 252; People v. Williams, 32 Cal. 280.]" [Pickett v. Wallace, 54 Cal. 147.] Under the showing made here we cannot hold appellants were alone in fault. They did what they could to furnish it all. To make a call for it in the bill of exceptions is allowable. [R. S. 1909, sec. 2083.] It is likely it has been mislaid and can be produced at the next trial, or parol testimony may be resorted to to establish its contents as a *dernier ressort*.

Besides all that, we are relieved from embarrassment in the premises because there is nothing to show nor is it claimed that exhibit A was a final accounting showing full settlement with and an acquittance by Mrs. Mahaffey. Therefore, as we have ruled with respondent on the present record for the purposes of their appeal, except as to Mrs. Mahaffey, respondent has not been injured by the absence of that exhibit.

VI. As the judgment must be reversed as to Mrs. Mahaffey insofar as it is in favor of respondent's full ownership of tract A, and as the cause was loosely tried, we think it better to reverse it as to all the appellants in order that no mistake be made by our passing on the merits on a record in the present fix.

Questions on the admissibility of evidence may not arise on the next trial, hence are passed by. Besides, they are of little avail in equity where excluded testi-

mony comes up as well as that allowed and objected to. [McKee v. Downing, 224 Mo. l. c. 135 et seq.]

The premises all considered, the judgment so far as it is in favor of respondent's full ownership of tract A is reversed and the cause remanded to be proceeded with on a new trial to final judgment and decree in accordance with the views herein expressed.

*Woodson, P. J.,* and *Graves, J.,* concur in full; *Bond, J.,* concurs only in result and reversing and remanding.