**Nina Johnson HIGGERSON, Appellant,**

v.

**Andrew J. HIGGERSON, Jr., et al.,
Respondents.**

**No. 9509.**

Missouri Court of Appeals,
Springfield District.

April 20, 1973.

Charles C. Hatley, New Madrid, for appellant.

Hal E. Hunter, Jr., New Madrid, for respondents.

BILLINGS, Judge.

In this court-tried case judgment was entered for the defendants on plaintiffs' petition to quiet title by adverse possession to a sixty-acre farm and partition was ordered pursuant to defendants' counterclaim. We affirm.

John Wesley LaPlant, the common source of title, died in 1921 survived by his mother, Mary, and his sister Dora. Dora was the wife of Andrew Jackson Higgerson and among their eleven children was Arthur who was married to Nina [Nina and her ten children were plaintiffs herein but only Nina prosecutes this appeal].

Grandmother Mary was living on the farm with John at the time of his death and at her request Arthur and Nina moved to the farm. Grandmother Mary died in 1923, Dora died in 1934,[1] Andrew Jackson Higgerson died in 1949 and Arthur died in 1966.

Arthur farmed the tillable twenty-five acres of the farm [the remaining acreage consisting of pasture and woods] until 1961 at which time his son Robert took over the farming operation and payed his father crop rent. Since Arthur's death, Robert has continued to farm and pays his mother crop rent.

There is no dispute as to certain facts: the occupation and farming of the lands from 1921 until 1966 by Arthur; the occupation of the lands from 1966 until time of trial in 1971 by Nina and the farming from 1966 to 1971 by her son Robert; the real estate taxes being paid until 1966 by Arthur [with possibly some contribution by his mother, Dora] and since that time by Nina; the rents and profits from 1921 until 1971 being retained by Arthur or Nina as well as the proceeds from various govern-

ment farm programs which listed Arthur as "owner". During his occupancy Arthur did some fencing, some fence repairing, and re-built the house in 1937 and 1943 following fires. The last house built was a one-room house and Nina now lives in a house-trailer on the premises.

In 1951 Arthur began seeking quitclaim deeds from his brothers and sisters (or their descendants) and continued such efforts until his death. He obtained such deeds from two of his brothers, one sister, the surviving husband of a deceased sister, and one of the two children of the deceased sister. Another brother quitclaimed his interest to Nina after this suit was filed in 1969. Efforts to obtain quitclaim deeds from other of Dora's descendants by Arthur, Nina and Robert were unsuccessful.

Nina, 70 years of age at trial time, testified that when she and her husband moved to the farm in 1921 Grandmother Mary LaPlant was about 85 or 86 years of age and "pretty feeble". During all of the time she and her husband were on the farm none of the defendants had ever "asked you all to share this farm or get off this farm." However, she stated that prior to her mother-in-law's death in 1935 Arthur was living on and farming the land with his mother's consent; that Arthur recognized his mother's right and interest in the farm and that he did not claim the farm adversely to her; further, that after Dora's death Arthur recognized the interests of his brothers and sisters in the property and "that is how come him to have these quitclaim deeds he tried to get"—that Arthur had the consent of his brothers and sisters to live on the property during his lifetime.

Nina served as administratrix of her husband's estate and Arthur's interest in the farm was inventoried and ordered distributed to his heirs as an "undivided interest".

---

[1] At John's death the title to the farm passed equally to his mother and sister. At the mother' death her one-half interest descended to Dora. § 303, RSMo., 1919; § 306, RSMo., 1929.

Andrew Higgerson a brother of Arthur who released his interest to Nina after this suit was filed, testified that " . . . (G)randmother Mary gave this place to my brother to come and live with Grandma as long as she lived." He said Arthur recognized his [Andrew's] interest in the farm and had inquired of him if he had received the deed Arthur had mailed him for execution. Harold Higgerson, a brother of Arthur, refused to sign a deed at Arthur's request in 1965, having earlier denied such a request. Alice Higgerson Taylor, a sister of Arthur, was requested by Arthur to release her interest to him on two occasions, the last time being in 1965. Mildred Henry, daughter of Arthur's deceased sister Nevada, was contacted by Arthur to deed her interest in the property six months before his death and again the day he died. She refused. After Arthur's death in 1966 Robert unsuccessfully sought to obtain a deed from Velva Gullion, another daughter of Nevada.

In ruling against plaintiffs' claim of title by adverse possession the trial court, inter alia, made the following findings: that the evidence did not establish a gift of the farm by Grandmother Mary, acquiesced in by Dora, to Arthur and Nina for services; that the lack of exclusive ownership and lack of actual color of title in plaintiffs were such that it did not render the facts as to adverse possession apparent; that the parties were tenants in common to the farm and the evidence did not show sufficient adverse possession against the cotenants; that the possession and control of Arthur and Nina was of a permissive nature and they had no color of title as to all the property and the proof of adverse possession was not unequivocal and unmistakable to the extent that it imparted notice to the cotenants.

In this court Nina contends Arthur's adverse possession was under color of title, and in the alternative, without color of title the claimed adverse possession was of such exclusive and unequivocal nature as to defeat and repudiate any rights of the

cotenants-defendants. Nina argues that by Arthur going on the farm in 1921 and continuously cultivating, maintaining, improving and paying taxes on the property that this manifested exclusive ownership sufficient to deny the rights of his cotenants. Further, this is not a case of "permissive adverse possession".

The scope of our review is governed by Rule 73.01(d), V.A.M.R., and while we review the case upon both the law and evidence the judgment is not to be set aside unless clearly erroneous, giving due regard to the opportunity of the trial court to judge of the credibility of the witnesses. Additionally, where there is a direct conflict in the testimony deference is to be given the trial court's conclusions. Nutz v. Shepherd, 490 S.W.2d 366 (Mo. App.1973); Kester v. Jeter, 481 S.W.2d 510 (Mo.App.1972); Dill v. Poindexter Tile Co., 451 S.W.2d 365 (Mo.App.1970). In Dill we said, at page 371: " . . . (I)n court-tried actions we are obliged to accept as true the evidence and all permissible inferences therefrom favorable to the prevailing party and disregard such testimony as is contrary thereto [cases], and not to set aside the judgment unless it is clearly erroneous."

Plaintiff relies upon Wunderlich v. Baumgarth, 437 S.W.2d 78 (Mo.1969) as support for her theory that color of title existed and thus her burden to establish Arthur's adverse possession against defendants is lightened. This case is of no help to Nina because: (1) the trial court found, and we agree, that the evidence did not show a valid gift of the farm; (2) the court in Wunderlich, found the *deed* therein constituted color of title and therefore the presumption of law that the possession of one tenant in common is the possession of his cotenants was not strictly applicable; and, (3) Missouri follows the majority rule that a *writing* which purports to give title to the premises is essential to give color of title to an adverse occupant. Joplin Brewing Co. v. Payne, 197 Mo. 422, 94 S.W.

896, 3 Am.Jur.2d, Adverse Possession, § 107; Annot., 43 A.L.R.2d 13 (1955); Annot., 2 A.L.R. 1457 (1919). We hold Arthur's occupancy of the farm was not under color of title.

This brings us to the second issue, namely, whether the claimed adverse possession was so unequivocal and unmistakable as to put Arthur's cotenants on notice that adverse claims were being asserted. On this question Nina contends Replogle v. Replogle, 350 S.W.2d 735 (Mo.1961) supports her position. In that case a father had died leaving two brothers as the only heirs and defendant-brother had gone into possession of all the land following his father's death. Plaintiff-brother had been missing for more than seven years and defendant-brother, proceeding under the applicable probate law, had obtained a declaration that plaintiff was presumed dead and letters of administration were granted defendant on plaintiff's estate and one-half of the lands involved had been inventoried as a part of plaintiff's estate. Final settlement was made in May of 1939. Defendant's attorney had told him that at the end of the administration of his brother's estate the land would be his [defendant's]. Following the father's death defendant exercised visible rights and acts of ownership. After detailing the law of this state concerning adverse possession between tenants in common, including the presumption of law that such a tenant holds possession for his cotenants (Mann v. Mann, 353 Mo. 619, 183 S.W.2d 557 (1944)), the court said the administration by defendant of his brother's estate under the presumed death statute (350 S.W.2d 1.c. 739) ". . . was clearly for the purpose and with the intent of eliminating plaintiff's interest in the land and defendant's evidence sufficiently shows that thereafter he *believed* he owned it, *claimed* to own it and exercised *unequivocal* acts of ownership over it and of an *overt,* notorious character sufficient to constitute notice of his claim." (emphasis added)

▮▮ The rules pertaining to adverse possession by a cotenant aside for the moment, nevertheless if Arthur's possession was permissive at its inception, then it remained so until his hostile claim was brought home to the true owner[s]. Williams v. Diederich, 359 Mo. 683, 223 S.W. 2d 402 (1949). And without the element of permissiveness, possession, no matter how long continued, will not divest the true owner of title unless such possession is adverse; to be adverse, it must be hostile, that is, under a claim of ownership or title. "One will not acquire title by adverse possession who merely takes possession upon the theory that after he has held possession for the requisite statutory period his possession will ripen into title, but on the contrary his possession must at all times be under claim of ownership or title before it may develop into a perfect and completed title at the termination of the limitation period. . . . [S]uch claim [must] be thereafter maintained for the full period of limitation without any disclaimer of title . . . or recognition of title in any one other than themselves." Riebold v. Smith, 150 S.W.2d 599 (Mo. App.1941).

Here, Nina's testimony disclosed that Arthur's entry into possession of the farm in 1921 was permissive in its inception by reason of Grandmother Mary's request. Nina acknowledged that her husband's occupancy was not adverse to his mother and that Arthur recognized her interest in the farm. Upon Dora's death Arthur and his brother and sisters inherited the farm, subject to the rights of her surviving husband, and became tenants in common. Nina testified that her husband had the *consent* of his brothers and sisters to remain on the farm *during his lifetime and that he recognized their interests in the farm.* There was evidence that Arthur began attempting to obtain deeds from his cotenants (or their heirs) as early as 1951 [two such deeds were obtained and recorded in June of 1966 approximately a month before he died].

While it is true, as cases relied upon by Nina point out, a tenant in common can acquire title by adverse possession against his cotenants the burden on such a claimant is a heavy one. The evidence of such adverse possession must be clear and pointed. Nickey v. Leader, 235 Mo. 30, 138 S.W. 18 (1911). Cogent proof is required to overcome the presumption that the claimant holds possession for his cotenants. Hynds v. Hynds, 253 Mo. 20, 161 S.W. 812 (1913). The acts, verbal or otherwise, to show an adverse claim must be acts clearly repudiating and denying the rights of the cotenant. Allen v. Morris, 244 Mo. 357, 148 S.W. 905 (1912). Also see Annot., Adverse Possession—Cotenants, 82 A.L.R.2d 5 (1962).

Considering the foregoing circumstances and applicable law we cannot say the judgment of the trial court was clearly erroneous and the judgment is affirmed.

TITUS, C. J., and STONE and HOGAN, JJ., concur.